In re Emmerich **HANDLER** a/k/a Isaac Handler and Rita Handler a/k/a Rifka Handler, Debtors.

David J. Doyaga, Esq., As Trustee of the estate of Emmerich and Rita Handler, Plaintiff

v.

Samuel Roth, Morris Roth, Agnes Roth, Hanshe Liebowitz, Eleazar Handler and Chaim Tescher, Defendants.

Bankruptcy No. 00–14960–608.
Adversary No. 02–1303–608.

United States Bankruptcy Court, E.D. New York.

Sept. 28, 2007.

Gary F. Herbst, Esq., LaMonica Herbst & Maniscalco, LLP, Wantagh, NY, Attorneys for the Chapter 7 trustee.

Israel Weinstock, Belle Harbor, NY, Creditor.

M. David Graubard, Esq., Kera & Graubard, New York, NY, Attorneys for Defendants Samuel Roth, Morris Roth, Agnes Roth and Hanshe Leibowitz.

David J. Doyaga, Sr., Esq., Brooklyn, NY, Chapter 7 trustee.

## DECISION

CARLA E. CRAIG, Chief Judge.

This matter comes before the Court on the motion of David J. Doyaga, Sr., (the "trustee"), the chapter 7 trustee of the estate of Emmerich Handler and Rita Handler (together with Mr. Handler, "the debtors") to approve the stipulations of settlement with Samuel Roth ("Mr.Roth"), Agnes Roth ("Mrs.Roth") and their son, Morris Roth ("Morris") (collectively, "the Roths"), and the debtors' daughter, Hanshe Leibowitz (together with the Roths, the "defendants"). Israel Weinstock and MLE Realty Associates (together, "Mr.Weinstock") objected to the approval of the settlements. An evidentiary hearing was held during which the Court heard testimony from the trustee and Mr. Ricky S. Spike, a certified public accountant who was designated as an expert witness. For the reasons stated herein, the motion to approve the settlements with the defendants is granted.

### Jurisdiction

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 157

and 1334(b) and the Eastern District of New York standing order of reference dated August 28, 1986. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Fed. R. Bankr.P. 7052.

### Background

On May 8, 2000, the debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code. On December 15, 2000, the case was converted to one under chapter 7.

On May 6, 2002, the trustee commenced this adversary proceeding against the Roths, Mrs. Leibowitz, Eleazar Handler ("Eleazar"), and Chaim Tescher, seeking, among other things, the recovery of alleged fraudulent transfers of the debtors' assets. The trustee later entered into court-approved settlements with Eleazar and Mr. Tescher.

On September 30, 2003, the trustee commenced an action seeking to deny the debtors a discharge pursuant to 11 U.S.C. § 727, based upon the debtors' alleged fraudulent transfers, failure to keep proper records of their finances and transactions, knowingly and fraudulently withholding information relating to their assets and financial affairs, as well as their failure to explain the loss or deficiency of assets to meet their liabilities.

In response, the debtors filed counterclaims against the trustee for breach of fiduciary duty, negligence, breach of statutory duties prescribed in 11 U.S.C. §§ 323 and 704, and for negligent infliction of emotional distress. The debtors moved for the imposition of sanctions against the trustee and for his removal from the case pursuant to 11 U.S.C. § 324(a) for the wrongful pursuit of claims and failure to close the estate in a timely manner. The

trustee cross-moved for the imposition of sanctions against the debtors.

On March 12, 2004, Mrs. Leibowitz filed a motion to dismiss the claims against her. On November 27, 2006, the Court granted Mrs. Leibowitz's motion, and granted the trustee leave to file an amended complaint. Thereafter, on January 5, 2007, the trustee filed an amended complaint, which clarified the legal basis for the relief sought.

### The Relevant Allegations of the Amended Complaint

**A. 4200 Avenue K. Associates, L.P.**

From 1987 through 1995, Mrs. Handler held a 44–54% interest in 4200 Avenue K Associates, L.P. ("4200"), which she transferred to the Roths for no consideration, notwithstanding the pendency of a restraining notice ("Restraining Notice") which prohibited the transfer, sale, or assignment of any of the debtors' assets. (Complaint[1] ¶¶ 40, 51, 52, 56, 61.) The Restraining Notice was served on the debtors in 1991 by a judgment creditor, First New York Bank for Business. (Complaint ¶ 40.)

Mr. Handler directed 4200's accountants to transfer Jack Walker's 3% interest in 4200, which was really property of the debtors, to Mrs. Leibowitz. (Complaint ¶¶ 67, 68.) Mrs. Leibowitz did not pay for this interest. (Complaint ¶ 69.)

In 1998, 4200 refinanced real property it owned and borrowed the principal sum of $1,011,439. (Complaint ¶ 76.) The proceeds from the refinancing were distributed to the shareholders of 4200, including the Roths. (Complaint ¶ 77). In 1999, 4200 sold the refinanced property, in addition to another piece of real property, for $7.4 million, which resulted in net sale proceeds of $3.2 million and a $1 million

---

1. "Complaint" refers to the amended complaint filed in this adversary proceeding on

January 5, 2007.

purchase money mortgage bearing an interest rate of 10%. (Complaint ¶¶ 78, 80, 81.) Mr. Handler was the point of contact for all negotiations concerning the sale of these properties. (Complaint ¶ 79.)

The Roths received at least $2 million from their interests in 4200, which were initially acquired from Mrs. Handler for no consideration. (Complaint ¶ 87.) Therefore, the trustee seeks an order (1) declaring that the Roths' interests in 4200 and the distributions made to them from 4200 and the proceeds they received from the sale of 4200's real property are property of the estate; (2) directing the Roths to immediately turn over the estate's interest in 4200, and the distributions and sale proceeds received by them on account of their interests in 4200; (3) determining the distributive interests of the debtors and the Roths; and (4) directing a full and complete accounting. (Complaint ¶ 227.) The trustee also seeks a judgment against the Roths (1) setting aside the transfer of Mrs. Handler's interest in 4200 to them; (2) awarding no less than $2 million, plus interest; (3) imposing a constructive trust upon their interests in 4200, and the distributions and proceeds they received on account of those interests; and (4) awarding attorneys' fees and costs. (Complaint ¶¶ 232, 237, 241, 243, 248, 250.)

Mrs. Leibowitz received distributions in the amount of $100,000 on account of her interest in 4200. (Complaint ¶ 88.) Therefore, the trustee seeks an order (1) declaring that Mrs. Leibowitz's 3% interest in 4200 is property of the estate; (2) directing her to turn over the estate's interest in 4200; (3) determining the distributive interests of the debtors and Mrs. Leibowitz; and (4) directing a full and complete accounting. (Complaint ¶ 253.) The trustee also seeks a judgment against Mrs. Leibowitz (1) setting aside the transfer to her of the 3% interest in 4200; (2) imposing a constructive trust on her inter-

est in 4200; (3) awarding no less than $100,000, plus interest; and (4) awarding attorneys' fees and costs. (Complaint ¶¶ 258, 263, 267, 269, 274, 276.)

### B. *Apartments in Queens County and New York County*

Cape Management managed 71 apartments located in Queens, New York and New York, New York (the "Apartments"). (Complaint ¶ 91, 95.) Mr. Handler made all decisions relating to the Apartments and exercised complete dominion and control over them. (Complaint ¶¶ 96, 102, 103.) Mrs. Liebowitz did not list any interest in the Apartments on her income tax returns and testified that she did not know she held an interest in the Apartments. (Complaint ¶¶ 98, 99.)

Mrs. Leibowitz received distributions of at least $50,000 from her interest in the Apartments. (Complaint ¶¶ 279, 290.) Therefore, the trustee seeks an order (1) declaring that Mrs. Leibowitz's interest in the Apartments is property of the estate; (2) directing Mrs. Leibowitz to turn over the debtors' interest in the Apartments; (3) determining the distributive interests of the debtors and Mrs. Leibowitz in the Apartments; and (4) directing a full and complete accounting. (Complaint ¶ 279.) The trustee also seeks a judgment against Mrs. Leibowitz (1) imposing a constructive trust on her interests in the Apartments; (2) imposing an equitable lien against her interest in the Apartments and any income she received therefrom; and (3) awarding no less than $50,000. (Complaint, at ¶¶ 279, 284, 288, 290.)

### C. *95–117 Ravine Avenue, Yonkers, New York*

Mrs. Handler held a mortgage of approximately $900,000 on property located at 95–117 Ravine Avenue, Yonkers, New York ("Ravine Mortgage"). (Complaint

¶ 104.) In 1992, Mrs. Handler transferred her interest in approximately $260,000 of the mortgage to a person named William Ain. (Complaint ¶ 105.) In 1995, Mrs. Handler transferred the rest of her interest in the mortgage to Mr. Roth for no consideration (the "Ravine Transfer"). (Complaint ¶¶ 105, 106, 115.) Both transfers were made in violation of the Restraining Notice. (Complaint ¶ 107.)

In 1995, Mr. Roth received $1.5 million when the mortgage was repaid. (Complaint ¶¶ 110, 112.) The trustee seeks an order (1) declaring that Mr. Roth's interest in the Ravine Mortgage is property of the estate; (2) directing Mr. Roth to turn over the debtors' interest in the proceeds received from the Ravine Transfer; (3) determining the distributive interests of the debtors and Mr. Roth in the proceeds received from the Ravine Transfer; and (4) directing a full and complete accounting. (Complaint ¶ 293.) The trustee also seeks a judgment against Mr. Roth (1) setting aside the Ravine Transfer; (2) awarding no less than $1.5 million, plus interest; (3) imposing a constructive trust on the proceeds received from the Ravine Transfer; and (4) awarding attorneys' fees and costs. (Complaint ¶¶ 298, 303, 309, 311, 316, 318.)

### D. *3 East 63rd Street Realty Corp.*

In 1979, Mrs. Handler acquired a 33% interest in 3 East 63rd Street Realty Corp. ("3 East Corp.") for $500,000. (Complaint ¶ 117.) In 1987, Mrs. Handler acquired a one-sixth interest in real property located at 3 East 63rd Street, New York, New York (the "3 East Property"). (Complaint ¶ 118.) At Mr. Handler's direction, Mrs. Handler conveyed her interest in the 3 East Property to 3 East Corp. for no consideration and in violation of the Restraining Notice. (Complaint ¶¶ 119, 120, 121, 126.)

In 1998, 3 East 63rd Street, LLC ("3 East LLC") was formed, with Mr. Roth and Morris as its principal shareholders, officers and directors. (Complaint ¶¶ 123, 124.) In that same year, 3 East Corp. conveyed its interest in the 3 East Property to 3 East LLC, in lieu of foreclosure and for less than fair consideration. (Complaint ¶¶ 125, 127, 129.) The 3 East Property was then refinanced for $650,000, from which Mr. Roth and Morris received proceeds. (Complaint ¶ 140.) Subsequently, 3 East LLC sold the 3 East Property for $3.2 million, and Mr. Roth and Morris received a substantial portion of the sale proceeds. (Complaint ¶¶ 135, 136.)

The trustee seeks an order (1) declaring that the interests of Mr. Roth and Morris in the 3 East Property are property of the estate; (2) directing Mr. Roth and Morris to turn over the estate's interest in the 3 East Property; (3) determining the distributive interests of the debtors, Mr. Roth and Morris; and (4) directing a full and complete accounting. (Complaint ¶ 322.) The trustee also seeks a judgment against Mr. Roth and Morris (1) imposing a constructive trust on their interests in the 3 East Property and the proceeds of the sale of the 3 East Property; (2) imposing an equitable lien against the proceeds from the sale of the 3 East Property; (3) awarding no less than $700,000, plus interest; (4) setting aside the transfer of the 3 East Property; and (5) awarding attorneys' fees and costs. (Complaint ¶¶ 327, 331, 338, 351.)

### E. *Joint Venture V*

In 1988, a trust was established for the benefit of Mrs. Leibowitz and Eleazar. (Complaint ¶ 146.) The trust invested in an entity known as Joint Venture V ("JVV"). (Complaint ¶ 147.) Mrs. Leibowitz and Eleazar each had an 18% interest in JVV; these interests were purchased by the trust for them with $250,000

of Mr. Handler's money. (Complaint ¶¶ 148, 149.) In 2000, Mrs. Leibowitz acquired an additional 26% interest in JVV. (Complaint ¶ 150.) Although Mrs. Leibowitz and Eleazar held the interests in JVV, Mr. Handler was the beneficial owner of JVV. (Complaint ¶ 164.)

The trust owned and sold certain apartments and the sale proceeds were deposited in the trust. (Complaint ¶¶ 152, 153.) In November 2001, Mr. Handler caused 3 East Corp. or 3 East LLC to pay $100,000 to JVV in order to buy out a tenant from one of JVV's apartments. (Complaint ¶¶ 168, 169.) Thereafter, Mr. Handler approved the sale of one of JVV's apartments for $325,000. (Complaint ¶¶ 170, 171.)

All of the distributions on account of Mrs. Leibowitz's interest in JVV were placed into a bank account in her name, including the net proceeds of the sale of the apartment. (Complaint ¶¶ 158, 171.) Mr. Handler controlled this bank account and used it to pay his personal expenses. (Complaint ¶¶ 160, 161.)

Mrs. Leibowitz received at least $450,000 from her interest in JVV. (Complaint ¶¶ 355, 366.) Therefore, the trustee seeks an order (1) declaring that Mrs. Leibowitz's interest in JVV is property of the estate; (2) directing Mrs. Leibowitz to turn over that interest in JVV; and (3) directing a complete accounting. (Complaint ¶ 355.) The trustee also seeks a judgment against Mrs. Leibowitz (1) imposing a constructive trust on her interest in JVV; (2) imposing an equitable lien against her interest in JVV; and (3) awarding no less than $450,000, plus interest. (Complaint ¶¶ 360, 364, 366.)

F. *622 West 114th Street, New York, New York*

In 1985, Mrs. Handler acquired a 60% interest in Associates 64 and/or 114th Realty Associates ("114th Realty") for $1 million. (Complaint ¶¶ 177, 178). In 1986,

Associates 64 conveyed real property located at 622 West 114th Street, New York, New York (the "622 West Property") to Associates 64. (Complaint ¶ 181.) Subsequently, in 1988, the 622 West Property was conveyed to 622 West 114th Street Owners Corp. ("622 West Corp.").

In 1998, Mr. Handler contacted an individual named Jerome Bloom in order to cause Mr. Bloom to acquire shares of 622 West Corp.'s capital stock, which were held by 114th Realty, which would result in the ownership of the 622 West Property. (Complaint ¶¶ 184,185.) Mr. Bloom formed 620 West 144th Street, LLC ("620 West LLC") and Mrs. Leibowitz received a 50% interest in 620 West LLC for no consideration. (Complaint ¶¶ 186, 188, 189.)

In October 1998, Mrs. Handler sold her interest in the 622 West Property to 620 West LLC for no consideration. (Complaint ¶ 190.) Thereafter, eight of the fourteen apartments located at the 622 West Property were sold. (Complaint ¶ 196.)

In addition to transferring her interest in the 622 West Property, between 1999 and 2001, Mrs. Handler, in her capacity as general partner of 114th Realty, assigned valuable proprietary leases between 114th Realty and 622 West Corp. to 620 West LLC for $10, as well as other interests, which greatly diminished the value of her interests in 114th Realty. (Complaint ¶¶ 192, 193, 194.) All of these transfers were made in violation of the Restraining Notice. (Complaint ¶ 195.)

In 2000 and 2001, distributions from 620 West LLC totaling $232,000 were deposited in a bank account in Mrs. Leibowitz's name. (Complaint ¶¶ 198, 199, 203.) Mr. Handler exercised complete control over this bank account, 114th Realty, 620 West LLC, 622 West Corp., the 622 West Property, and all of the proceeds from the sales

and rentals from the apartments located in the 622 West Property. (Complaint ¶ 205.)

The trustee seeks an order (1) declaring that Mrs. Leibowitz's interest in the 622 West Property or the entity holding title to that property is property of the estate; (2) directing her to turn over her claimed interest in the 622 West Property or the entity holding title to that property; and (3) directing a complete accounting of all monies she received on account of her interest in the 622 West Property or the entity holding title to such property. (Complaint ¶ 369.) The trustee also seeks a judgment against Mrs. Leibowitz (1) imposing an equitable lien and constructive trust upon her interest in the 622 West Property or the entity holding title to such property and any distributions made pursuant to that interest; (2) awarding the trustee no less than $232,000, plus interest; (3) setting aside her interest in the 622 West Property and 620 West LLC; and (4) awarding attorneys' fees and costs. (Complaint ¶¶ 373, 377, 379, 384, 389, 394, 396.)

### G. Bank Accounts

In 2002, Mrs. Leibowitz opened a bank account at Independence Savings Bank. (Complaint ¶ 206.) Previously, she had an account with Chemical Bank (together with the account at Independence Savings Bank, the "Hanshe Accounts"). (Complaint ¶ 207.) Mrs. Leibowitz has lived in Israel since 1985, and used the debtors' address as her address for the Hanshe Accounts. (Complaint ¶ 210.) The debtors had complete access to the funds in the Hanshe Accounts and made most, if not all, of the deposits into those accounts. (Complaint ¶¶ 211, 212.) Mrs. Leibowitz left the debtors with pre-signed checks for the Hanshe Accounts. (Complaint, at ¶ 214). Most of the deposits were from investments held in Mrs. Leibowitz's and Eleazar's name, but over which Mr. Handler maintained complete control. (Com-

plaint ¶ 220.) Additionally, under the proposed settlement, most of funds in the Hanshe Accounts were used by the debtors to pay their personal bills and expenses. (Complaint ¶ 215.) Since 1998, the distributions from the Hanshe Accounts exceeded $1 million. (Complaint ¶ 223.)

The trustee seeks an order (1) declaring that the Hanshe Accounts, the funds therein, and any distributions made from those accounts are property of the estate; (2) directing Mrs. Leibowitz to turn over the remaining funds in the account; and (3) directing a complete accounting of all monies received, deposited, and disbursed from the Hanshe Accounts. (Complaint ¶ 400.) The trustee also seeks a judgment against Mrs. Leibowitz (1) imposing a constructive trust and equitable lien on the Hanshe Accounts and any distributions made therefrom; and (2) awarding no less than $1 million, plus interest. (Complaint ¶¶ 400, 405, 411.)

### Previous Proposed Settlements

In January 2005, the trustee sought to settle his action against Mrs. Liebowitz, which sought recovery from her of approximately $1.67 million, for $100,000, which was to be paid 60 days after the settlement was approved. Mrs. Liebowitz agreed to waive, withdraw and release any and all claims against the estate, trustee and his professionals and the right, if any, to receive a distribution from the estate. If Mrs. Liebowitz breached the terms of the settlement, the trustee would have retained any money and property received by the settlement and the release of the claims against her will be null and void. This settlement was contingent on the approval of a proposed settlement of the § 727 action between the trustee and the debtors.

In January 2005, the trustee also sought to settle the § 727 action against the debt-

ors in exchange for the withdrawal of their counterclaims and motion for sanctions against him. The trustee agreed to withdraw the estate's claims against the debtors upon the receipt of Mrs. Leibowitz's payment of $100,000 pursuant to her settlement with the trustee. Additionally, under the proposed settlement, the trustee would have abandoned the estate's interest in real property located at 1537 50th Street, Brooklyn, NY, 11219, which is the debtors' residence. The debtors agreed to waive, withdraw and release any and all claims for distributions against the estate, the trustee and his professionals. The settlement with the debtors was contingent on the approval of the settlement with Mrs. Liebowitz.

In January 2005, the trustee also sought to settle his action against the Roths, in which he sought recoveries totaling $4.2 million, for two payments totaling $450,000. The initial payment of $150,000 was made to the trustee. The trustee would have received a first mortgage on real property located at 1560 52nd Street, Brooklyn, NY, which had an asserted value of at least $500,000, to secure the balance of the settlement amount. During the term of the settlement, the Roths would maintain the collateral, making all tax and other necessary payments. To further secure the balance of the amount owed, the settlement provided for a confession of judgment in the amount of $400,000 in the event of a default. The Roths agreed to waive all claims against the estate, trustee and his professionals and their rights, if any, to receive a distribution from the estate.

Mr. Weinstock objected to the settlements with the debtors and the defendants. On March 28, 2006, this Court denied the trustee's motion to approve

those settlements, without prejudice to renewal upon a more complete record.

At that time, the trustee's most significant argument in support of the settlements was that the settlement amounts would be nontaxable, while any recovery from litigating the claims would be taxable to the estate as capital gains. The trustee did not cite any statute or case law to support that determination, nor did he provide a detailed analysis or calculation of the tax consequences if the adversary proceeding were successfully litigated. Therefore, on the record presented, the Court was unable to approve the settlements because it was unclear what weight should be given to the asserted tax benefit.

*The Instant Proposed Settlements*

The trustee now seeks to settle his claims against the Roths, pursuant to which he sought recovery totaling $4.2 million.[2] Pursuant to the proposed settlement, the Roths agree to pay the trustee $1 million, half of which was paid upon the execution of the stipulation, and the other half was due to be paid July 17, 2007. To secure the second half of the payment, the Roths agreed to provide the trustee with a first mortgage on real property located at 1560 52nd Street, Brooklyn, New York, which has a value of at least $600,000. As further security, the Roths agreed to execute a confession of judgment for $600,000 in the trustee's favor. The Roths also agreed to waive, withdraw and release any and all claims against the estate, the trustee or his professionals, and to waive any distribution from the estate. The Roths represented that they have not, and will not, accept from the debtors or other defendants, or anyone on their behalf "any funds or property regarding unresolved claims asserted against any of the other [d]efendants that are presently the subject

---

**2.** The trustee seeks $2 million from the Roths, jointly and severally; $1.5 million from Mr. Roth, individually; and $700,000 from Mr. Roth and Morris.

of the instant [action]." (Roth Stip. at 4.) However, if the claims against the remaining defendant, Mrs. Leibowitz, are settled, this representation will be terminated. Upon the approval of the stipulation, the trustee and the estate will waive and release any and all claims against the Roths.

The trustee also seeks to settle his claims asserted against Mrs. Leibowitz in the amended complaint, in which he sought recovery of $1.832 million, for a total payment of $250,000. The settlement payment was due by April 17, 2007, and the trustee is currently holding those funds. Mrs. Leibowitz has agreed to waive and release any and all claims against the estate, the trustee, and the trustee's professionals, as well as the right to receive any distribution from the estate. Like the Roths, Mrs. Leibowitz represented that she has not, and will not, accept from the debtors or other defendants, or anyone on their behalf, "any funds or property that are presently the subject of he instant [action]." (Leibowitz Stip. at 3.) However, if the claims against the remaining defendants, *i.e.,* the Roths, are settled, this representation will be terminated. Upon approval of the settlement, the trustee would waive and release all claims against Mrs. Leibowitz. Mr. Weinstock argued that these settlements should not be approved because the trustee did not satisfy the Court's direction to supplement the record with the appropriate information regarding the tax consequences of the settlements. Mr. Weinstock also objected to the term of the stipulation that provides for the termination of the defendants' representations that they have not, and will not, accept any funds or property regarding the unresolved claims that are the subject of this action upon the settlement with the remaining defendants. Mr. Weinstock argued that this provision "allows Roth to continue serving as a bank for Handler and essentially renders any claims that any creditors may have against Handler as futile." (Weinstock Decl. ¶ 4.) However, he did not explain what impact this would have on the estate nor has he provided any basis on which the Court can come to that conclusion.

The defendants argue that Mr. Weinstock's objection is without merit because the Court's direction to supplement the record was in connection with a different motion and different stipulations and is not applicable to the current motion. The defendants further argue that Mr. Weinstock's objection is a bad faith objection, which has the primary purpose of harassing the now-deceased Mr. Handler, Mrs. Handler and their family. (Resp. of Defs. to Weinstock's Objection, at 5–6.) The only support for this is the assertion that Mr. Weinstock made a comment, off the record, to the trustee that his objection is "about Handler." This is not a sufficient basis upon which to find that Mr. Weinstock has filed the objection in bad faith.

*Legal Standard*

 A bankruptcy court may approve a compromise and settlement if it is fair, reasonable and adequately based on the facts and circumstances before the court. Fed. R. Bankr.P. 9019; *S.E.C. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group),* 960 F.2d 285, 292–93 (2d Cir.1992), *cert. dismissed,* 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *In re Hibbard Brown & Co.,* 217 B.R. 41, 45 (Bankr.S.D.N.Y. 1998). "The legal standard for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate." *In re Adelphia Communications Corp.,* 327 B.R. 143, 158 (Bankr.S.D.N.Y.2005) (internal quotation marks omitted). The court's responsibility is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." In re W.T. Grant, 699 F.2d 599, 608 (2d

Cir.1983), *cert. denied sub nom; Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Adelphia*, 327 B.R. at 159.

■■■ The court may give weight to the trustee's opinion that the settlement is fair and equitable. *Adelphia*, 327 at 159; *In re Purofied Down Prods.*, 150 B.R. 519, 522 (S.D.N.Y.1993); *Official Comm. of Unsecured Creditors of Int'l Distribution Ctrs. Inc. v. James Talcott, Inc. (In re Int'l Distribution Ctrs.)*, 103 B.R. 420, 423 (S.D.N.Y.1989). It is not necessary for the bankruptcy court to rule on disputed issues of fact and law or to conduct a "mini trial" on the merits of the underlying litigation. *Adelphia*, 327 B.R. at 159; *In re Ashford Hotels*, 226 B.R. 797, 802 (Bankr. S.D.N.Y.1998). At the same time, a court may not simply defer to a trustee's judgment, but must independently evaluate the reasonableness of the settlement. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Kayo v. Fitzgerald*, 91 Fed.Appx. 714, 716 (2d Cir.2004); *Adelphia*, 327 B.R. at 159; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y.1991).

■■■ A court will consider the following factors to decide whether a settlement falls above or below the lowest point in the range of reasonableness:

a) The balance between the likelihood of success compared to the present and future benefits offered by the settlement;

b) The prospect of complex and protracted litigation if [the] settlement is not approved;

c) The proportion of class members who do not object or who affirmatively support the proposed settlement;

d) The competency and experience of counsel who support the proposed settlement;

e) The relative benefits to be received by individuals or groups within the class;

f) The nature and breadth of any releases to be issued as a result of the proposed settlement; and

g) The extent to which the settlement is the product of arm's length bargaining, and not the product of fraud or collusion.

*Drexel Burnham*, 134 B.R. at 499 (*citing In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y.1988)). *See also In re Spielfogel*, 211 B.R. 133, 143 (Bankr.E.D.N.Y.1997).

■■■ The first factor enumerated, the likelihood of success compared to the benefits of the settlement, is the most important factor in determining whether or not a settlement should be approved. *Adelphia*, 327 B.R. at 160. "There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has [been apprised] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated [and of the other relevant factors]." *TMT*, 390 U.S. at 424, 88 S.Ct. 1157; *Motorola, Inc.v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, No. 01 Civ. 5429, 2005 WL 756900, at *6 (S.D.N.Y. April 4, 2005).

*Discussion*

A. *Settlement with the Roths*

1. *Likelihood of successful litigation balanced against the benefits of the settlement*

a. *4200*

■■■ The trustee and Mr. Spike both testified that the maximum recovery that

could be obtained on the trustee's claims with respect to Mrs. Handler's 44% interest in 4200 is $1.259 million. (Tr.[3] at 18–20, 77.) They testified that this number is comprised of (1) $299,000, which is the amount Mrs. Handler should have received from her 44% of 4200 based on the refinance of the 4200 property in 1998; (2) $520,000, which represents the amount Mrs. Handler should have received from her 44% interest from the sale of the 4200 Property; and (3) $440,000, which represents the amount Mrs. Handler should have received from her 44% interest when 4200 took back a mortgage on the 4200 Property. (Tr. at 18–20, 77–79.)

The trustee testified that the Roths argue that they gave Mrs. Handler consideration for her interest in 4200, which is supported by Mrs. Handler's tax return for 1995. (Tr. at 27.) The trustee indicated Mrs. Handler's 1995 tax return reflects the receipt of payment for the transfer. (Tr. at 27.) Additionally, the trustee testified that the Roths have produced copies of checks made payable to members of the Handler family and they have argued that those checks represented payment for the interest in 4200. (Tr. at 27, 68) Previously the Roths have claimed that the transfer of Mrs. Handler's interest to them was in repayment of loans that they made to the debtors, and have provided the trustee with some documentation regarding these loans. (Trustee's Mot. at 9, ¶ 22.)

The trustee estimated that his chance of prevailing on the 4200 claims is 90%. (Tr. at 28.) The trustee testified that he gave the Roths' defenses to his 4200 claims little weight because the Roths cannot prove that Mrs. Handler actually received full payment in return for her interest in 4200,

because of the timing of the checks (on which the trustee did not elaborate) and because the checks were predominantly made payable to Mrs. Leibowitz. (Tr. at 28–29.)

Mr. Weinstock questioned why the trustee thought that Mrs. Handler had only a 44% interest in 4200, as opposed to a 54% interest. (Tr. at 55.) Mr. Weinstock contended that Mrs. Handler acquired another 10% from a Mr. Zuckerman. (Tr. at 55.) The trustee explained that although Mr. Handler had testified that he, presumably through Mrs. Handler, owns 55% of 4200, the trustee was unable to prove it based on any documentation. (Tr. at 55.) The trustee testified that in connection with these claims, he examined tax returns and various other documents to determine the debtors' interests in 4200. (Tr. at 57–59, 64; Trustee's Ex. 5 at Schedule K–1.)

### b. *Ravine Mortgage*

The trustee testified that, based on his examination of the Ravine Mortgage, and the payoff documents relating thereto, Mrs. Handler should have received $653,000 from her interest in the Ravine Mortgage. (Tr. at 22.) This amount is significantly less than the complaint's allegations that Mr. Roth received $1.5 million from Mrs. Handler's interest in the Ravine Mortgage.

The trustee and Mr. Spike both testified that of that amount, $13,000 would be taxable and $640,000 would be nontaxable because it is a return of principal. (Tr. at 22, 83.)

In defense to this claim, the Roths have asserted that they provided consideration in exchange for this interest and that this

---

**3.** "Tr." refers to the transcript of the hearing held on June 20, 2007. It must be noted that the transcript that appears on the docket of adversary case 03–1579 (Docket # 42) is not the full transcript. The references in this decision to the transcript relate to the full transcript of the hearing, which was ordered by the Court and does not appear on any of the dockets of this case or related actions.

transfer occurred outside the statute of limitations. (Trustee's Mot. at 10, ¶ 25.)

### c. *3 East Property*

The trustee testified that 3 East Corp. filed for bankruptcy protection in the Southern District of New York under chapter 11 of the Bankruptcy Code on May 11, 1993. (Tr. at 23.) That case was subsequently converted to one under chapter 7 of the Bankruptcy Code. (*Id.;* Trustee's Ex. 1.) In that case, 3 East Corp.'s secured creditor moved to compel the trustee to abandon the 3 East Property and the cash collateral that he was holding. (Trustee's Ex. 1.) The court granted that motion. (*Id.*) Thereafter, Shirley Berkowitz, who was represented by Mr. Weinstock, filed two motions seeking to vacate the order compelling the trustee to abandon the estate's property, but those motions were denied. (*Id.*) The trustee testified that, based on the events of 3 East Corp.'s bankruptcy case, Mrs. Handler's interest in 3 East Corp. and its assets were extinguished. (Tr. at 26–27.) For this reason, the trustee testified he concluded that the estate's claim against Mr. Roth and Morris regarding the 3 East Property, pursuant to which he sought recovery of $700,000, was ultimately valueless. (Tr. at 27.)

### 2. *Tax consequences of the settlement and time value of money*

The trustee testified that he concluded, after consulting with his tax expert, that if he settled his actions against the Roths for $1 million, no taxes would be due, because $640,000 of the recovery would be attributable to repayment of a promissory note, and the taxable gain above that amount could be offset by deducting administration expenses. (Tr. at 33.) However, if he recovered $1.912 million, which he estimated to be the maximum potential recovery against the Roths (consisting of $1.259 million on the 4200 claim and $653,000 on the

Ravine claim) approximately $251,000 in taxes would be due. (*Id.*)

Mr. Spike's testimony expanded on the tax consequences of the trustee's proposed settlement with the Roths. He testified that, in 1995, the debtors carried forward a loss of $2.9 million, which was fully deducted in that year. (Tr. at 75.) Mr. Spike also testified that, in 1995, the debtors recognized a capital gain of $1,094,180 from the disposition of Mrs. Handler's interest in 4200 (Tr. at 75; Trustee's Ex. 3, Schedule D, at 2.). Mr. Spike testified, that to the extent the debtors' estate would receive any more money from the interests in 4200, it would all be taxable. (Tr. at 75–76.)

Mr. Spike testified that he examined the payoff documents of the Ravine Mortgage, and that $640,000 of the $653,000 that the estate could recover was return of principal and would not be taxable. (Tr. at 83.) Therefore, after subtracting $640,000 nontaxable portion of the payment attributable to the Ravine Mortgage claims from the proposed $1 million settlement, the remaining settlement amount of $360,000, attributable to 4200, would be taxable. (Tr. at 83.) However, Mr. Spike testified that the trustee could offset the remaining amount of the proposed settlement agreement with the administrative costs of this estate, which are approximately $350,000–$375,000, leaving a taxable amount of zero. (Tr. 83–84.)

However, Mr. Spike testified that if the trustee recovered $1.912 million from the Roths after litigating the action, based on applicable tax rates, $251,000 in taxes would be due. (Tr. at 85.) The difference between collecting the $1 million settlement, which would not be subject to taxes, and collecting the full $1.912 million recoverable amount, subject to the $251,000 taxes, is roughly $660,000. (Tr. at 86.) In that connection, Mr Spike testified that in

evaluating the settlement, he attributed a value of approximately 5% per year, or $100,000, to the cost of the delay that would necessarily be involved in obtaining and collecting a judgment against the Roths, without taking into account the cost to recover the judgment, the risk of litigation, or the risk of collection. (Tr. at 86.)

Mr. Weinstock stated that Mr. Handler testified that he spent over $3 million in legal fees during the course of this case, which he asserted should be deductible from any recovery by the trustee. (Tr. at 92.) This argument is fundamentally flawed, because the legal fees paid by the debtors cannot be characterized as expenses of administration of this chapter 7 case; those fees were incurred by the debtors for their own benefit—in large part to defend the action brought by the trustee—and not for the benefit of the estate. For this reason the legal fees incurred by the debtors are not expenses of administration and cannot be deducted for tax purposes from any recovery by the trustee. *See* I.R.C. § 1398(h)(1) ("Any administrative expense allowed under section 503 of [the Bankruptcy Code] ... shall be allowed as a deduction.").

### 3. *Other considerations*

The trustee testified that a trial on the merits of the 4200 and Ravine Mortgage claims would be extremely lengthy and that if he were successful, he would have to enforce judgment against the Roths, whereas under the proposed settlement the estate would obtain $1 million without further litigation. (Tr. at 29–30.) The trustee also testified that the administrative costs, including trustee commissions, in pursuing the action to recover the full $1.912 million from the Roths, would be approximately $200,000. (Tr. at 32.)

It is apparent that litigation involving the debtors, Roths, and Mr. Weinstock was, and continues to be, complex and lengthy. The parties have engaged in litigation in state courts since 1984. Previous litigations relating to defamation claims and a champerty defense that involved those parties each lasted 8 days, and all sides incurred costs of hundreds of thousands of dollars. This is a reasonable preview of what is likely to occur if these cases are litigated to conclusion. Given the history of the litigation between these parties, it is certainly reasonable to predict that any decision on the merits would be appealed.

In reaching the settlement with the Roths, the trustee testified that he also considered the risk of not prevailing at trial, as well as the risk of collection. (Tr. at 31.) He testified that the Roths have a history of transferring and hiding assets, so even if he were successful in litigation, there is a risk that the Roths would have transferred their assets by the time he could seek to liquidate any judgment. (Tr. at 31.)

In response, Mr. Weinstock argues that the trustee also did not take into account the possibility of obtaining pre-judgment attachment. (Tr. at 95.) However, the record does not support a conclusion that the trustee would be entitled to such relief.

### B. *Settlement with Mrs. Leibowitz*

#### 1. *Likelihood of success balanced against the benefit of the settlement*

##### a. *The Apartments*

The trustee testified that, based on his examination of the rent roll from the Apartments, Mrs. Leibowitz, within the past seven years, has received a total of $14,000. (Tr. at 40.) This amount is significantly less than the $50,000 originally alleged. The trustee explained that the Apartments are located in Jackson Heights, Queens and are either rent controlled or rent stabilized. (*Id.*) The trus-

tee testified that the Apartments were already occupied by tenants when they were purchased and are still occupied by the original tenants. (Tr. at 41.)

In addition to the amount received by Mrs. Leibowitz, the trustee also investigated the value of Mrs. Leibowitz's 25% interest in the Apartments. (Tr. at 40–41.) He testified that he contacted several real estate brokers who are familiar with the Apartments. (Tr. at 41.) The trustee indicated that, based on his discussions with the brokers, the Apartments are essentially unsaleable because they are rent stabilized and rent controlled and the new owner would have to wait until the tenants either vacated the premises or died before the market value could be realized. (*Id.*)

The trustee also questioned his ability to liquidate Mrs. Leibowitz's 25% interest in the Apartments in order to make a distribution to creditors. (Tr. at 42.) If he could establish that the 25% interest in the Apartments belonged to the debtors and not to Mrs. Leibowitz, he would then be required to bring an action under § 363(h) of the Bankruptcy Code seeking to sell the Apartments against the holders of the remaining 75% interest in order to realize any value for the estate. (*Id.*) There is certainly no guarantee that such an action would succeed. Moreover, the trustee testified that he concluded the value of the Apartments was not significant in any event because of their rent-stabilized and rent-controlled status. (*Id.*)

b. *JVV*

The trustee testified that, based on his review of documentation, in 1988 or 1989, the debtors set up a trust in Mrs. Leibowitz's and Eleazar's name, and the trust purchased for each trust beneficiary an 18% interest in JVV. (Tr. at 43.) The trustee also testified that Mrs. Leibowitz acquired an additional 26% interest in JVV. (Tr. at 44.) Although the amended complaint alleges that the debtors' funds were used to purchase that additional interest in JVV, the trustee testified that based upon his investigation, he does not think he could prove that the purchase money actually came from the debtors. (Tr. at 44, 45.)

The trustee testified that JVV currently owns twelve cooperative apartments, which, like the Apartments, are rent stabilized and rent controlled. (Tr. at 44–45.) Therefore, the trustee believes it would be difficult for him to liquidate any interest in JVV that he may be able to recover. (Tr. at 45.) Furthermore, the trustee testified that he would not be able to initiate an action under § 363(h) of the Bankruptcy Code to sell the apartments because Mrs. Leibowitz's interest is in JVV, which in turn owns the apartments; Mrs. Liebowitz does not own any interest the apartments themselves. (Tr. at 45.)

For all of the above reasons, the trustee testified that he placed little value on his claims against Mrs. Leibowitz with respect to JVV.

c. *622 West Property*

The trustee testified that, according to his review of documentation, Mrs. Handler owned 60% of 114th Realty, which in turn owned fourteen rent stabilized and rent controlled cooperative apartments at the 622 West Property, some of which were sold when they ceased to be rent stabilized or rent controlled. (Tr. at 46, 53.) The trustee testified that after he reviewed documentation, interviewed witnesses, and conducted depositions, he concluded that Mrs. Handler's interest in 114th Realty was extinguished upon the confirmation of a chapter 11 plan in 114th Realty's bankruptcy case, which was filed in the Southern District of New York in 1996. (Tr. at 46–47; Trustee's Ex. 2.) The trustee testified that based upon his review of 114th

Realty's bankruptcy case, an individual named Mr. Pfeffer obtained essentially all of 114th Realty's assets, free of Mrs. Handler's claim. (Tr. at 48.) Eventually, Mrs. Leibowitz obtained an interest in the 622 West Property, and she may have ultimately received a profit on the sale of the 622 West Property. (Tr. at 60–62.) However, since whatever interest Mrs. Handler had in 114th Realty, and therefore, in the 622 West Property, was extinguished in 114th Realty's bankruptcy, the trustee does not believe that there is any value to his claim against Mrs. Leibowitz in connection with the 622 West Property. (Tr. at 48.)

### d. *4200*

The trustee testified that his claim against Mrs. Leibowitz in connection with her 3% interest in 4200 is weak as well. As in the case of the trustee's JVV claim against Mrs. Leibowitz, the trustee testified that he would not be able to prove that Mrs. Leibowitz's interest in 4200 was purchased with the debtors' money, and the value of that interest is minimal, if recoverable at all. (Tr. at 49.)

### e. *Hanshe Accounts*

The trustee testified that the Complaint alleges that the Hanshe Accounts held funds of the debtors, including funds that may have been paid by the Roths in connection with their interests in 4200. (Tr. at 49–50.) However, the trustee also testified that a substantial amount of funds from Mrs. Leibowitz's accounts were actually used by the debtors for their own benefit, over a period of many years. (Tr. at 50; Complaint ¶ 215.) The trustee testified that he believes that the proceeds from 4200 and the satisfaction of the Ravine Mortgage were ultimately deposited into the Hanshe Accounts, in the amount of approximately $500,000. (Tr. at 51). However, he believes it would be extremely difficult to recover on this claim because even if it can be proven that the money belonged to the debtors, it can be argued that consideration was given in the form of the debtors' use of the funds. (Tr. at 51.) The trustee testified that litigating this claim would be a complex process that would require extensive investigation to trace all the monies that were deposited and withdrawn from the account. (Tr. at 52.)

### 2. *Other considerations*

The trustee testified as to the risk of litigation and the risk of collection with regards to his claims against Mrs. Leibowitz. He testified that, unlike the Roths, Mrs. Leibowitz is not "significantly asset-rich." (Tr. at 52.) Although she owns interests in JVV, the Apartments, and the 622 West Property, the trustee testified that, as explained before, those assets are difficult to liquidate. Furthermore, the trustee testified that it is very difficult to ascertain the amount she received from the debtors' transfers. (Tr. at 53.) Additionally, the trustee testified that it appears that Mrs. Leibowitz has defenses to the claims in that at least a significant portion of the monies she received were returned to the debtors. (Tr. at 54.)

The trustee also testified that there is a significant risk that he would not be able to enforce any judgment against Mrs. Leibowitz. (Tr. at 53.) He believes that there is a risk that she would seek to avoid enforcement of any judgment against her by transferring assets, which would require the trustee to pursue recovery from transferees. (Tr. at 53.)

### C. *Considerations Relevant to Both Settlements*

### 1. *Trustee's ability to recover attorneys' fees from the defendants*

The trustee acknowledged that the estate's attorneys' fees may be recoverable

from the debtors and the defendants under § 276–a of the New York Debtor and Creditor Law, but testified that he would not necessarily be able to recover the amount that was actually incurred. (Tr. at 65.) He estimated that the estate's counsel fees, to date, is approximately $250,000. (Tr. at 66.) This amount does not include trustee fees. (Tr. at 66.) The trustee testified that he did not include the attorneys' fees in the estimated recovery amount because he has never seen such relief awarded. (Tr. at 66.)

■ Section 276–a of New York's Debtor and Creditor Law provides that a trustee can recover attorneys' fees incurred from seeking to set aside a transfer "made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors." N.Y. DEBT. & CRED. LAW § 276–a. Therefore, in order for the trustee to recover fees from the defendants not only must the transfer have been made by the debtors with actual intent to defraud, it must have been received by the defendants with actual intent to defraud the debtors's creditors as well. *See Ackerman v. Kovac (In re All Am. Petroleum Corp.)*, 259 B.R. 6, 19 (Bankr.E.D.N.Y. 2001) ("Under New York law, an award of attorneys' fees in a fraudulent conveyance action is not appropriate in the absence of a showing of actual intent on the part of the defendant."). Although the trustee's entitlement to attorneys' fees from the defendants is not before the Court, and is not being decided, it should be noted that the complaint does not allege that any of the transfers were received with actual intent to defraud, only that the transfers were made with such intent.

### 2. *Distribution to creditors*

If the settlements with the debtors are approved, the creditors in this case will receive approximately a 30% distribution on their claims, after factoring in administrative expenses, provided that the administrative expenses are approved. (Tr. at 7.) This is a substantial distribution, especially considering that this was originally a no-asset case. It should be noted that there had over $800,000 in priority claims, but after discussions between the trustee and the taxing authorities, this amount was reduced to $1,636. (Trustee's Mot. at 7, ¶ 16; Tr. at 8.) The trustee has successfully reduced the claims against the estate from approximately $92 million to $3.5–$3.6 million. (Trustee's Mot. at 7, ¶ 16; Tr. at 8.)

### 3. *Post-judgment and pre-judgment interest*

■ The trustee testified that any pre- or post-judgment interest to which the estate might be entitled would not be sufficient in amount to make the settlement unreasonable. (Tr. at 38.) While post-judgment interest is generally available, cases awarding pre-judgment interest in fraudulent conveyance actions are rare. *See United States v. Mazzeo*, 306 F.Supp.2d 294, 324 (E.D.N.Y.2004). While it is within a court's discretion whether to award pre-judgment interest, courts "have declined to award pre-judgment interest where the defendant[s] acted without knowledge of the wrongdoing and had no reason to know that the actions taken were wrongful." *Comm. of unsecured Creditors v. Interstate Distribution (In re Interstate Cigar Co.)*, 278 B.R. 8, 25 (Bankr.E.D.N.Y. 2002). While a claim for pre-judgment interest is not before the Court, and is not being decided, it should be noted that the complaint alleges that the transfers were made with intend to defraud, but does not allege that the defendants received the transfers with that same intent.

428

**D.** *Approval of the Settlements*

Based on the record, it is clear that the settlements with the defendants do not fall "below the lowest point in the range of reasonableness." *W.T. Grant,* 699 F.2d at 608. The trustee convincingly testified concerning the likelihood of success and recovery on the claims in light of the documentation produced, defenses asserted and risks of collection. Mr. Spike's testimony is equally persuasive and clearly establishes the current and future benefits of the settlement with the Roths, such as the tax consequences, the distribution to the estate's creditors, and the value of receiving immediate payment. It is also clear that the action, if litigated, would be complex and lengthy. It is not disputed that the settlements satisfy the other factors which must be considered, such as the arm's length nature of the settlements, competency of counsel, and the nature and breadth of releases. *Drexel Burnham,* 134 B.R. at 499. Therefore, the settlements with the defendants must be approved.

*Conclusion*

Based upon the record established at the evidentiary hearing, the motion to approve the settlements between the trustee and the defendants is granted. A separate order will be issued herewith.