**In re DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtor.**

**Bankruptcy No. 91–10421.**

United States Bankruptcy Court, S.D. New York.

Dec. 13, 1991.

See also 133 B.R. 13.

S. Carwile, B. Rein, and J. Petrruzzelli, Wiley, Rein & Fielding, Washington, D.C., for Frederick H. Joseph.

R. Davis, P. Gruenberger, and A. Miller, Weil, Gotshal & Manges, New York City, for Drexel Burnham Lambert Group, Inc.

M. Flumenbaum, A. Kornberg, and A. Liman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Michael R. Milken.

S. Glanzer, Dickstein, Shapiro & Morin, Washington, D.C., for Charles A. Thurnher.

M. Kirschner, Jones, Day, Reavis & Pogue, New York City, for creditors committee.

A. Manning, Wright, Manning, Rips & Maloney, New York City, for Kevin J. Madigan.

R. Millison, Cravath, Swaine & Moore, New York City, for FDIC/RTC.

C. Montgomery, Milgrim, Thomajan & Lee, P.C., New York City, for equity committee.

## MEMORANDUM OF DECISION ON BANKRUPTCY RULE 9019(a)

FRANCIS G. CONRAD, Bankruptcy Judge.

 The single issue[1] before this Court is whether or not we should approve a consulting and settlement agreement proposed by Debtor and Joseph, a Drexel insider. If a settlement agreement is fair and equitable and in a debtor's best interest, and those of its creditors', it will be approved. Approval of a compromise and settlement is committed to the sound discretion of the Court. In an exercise of that discretion, we hold that this consulting and settlement agreement meets this standard and approve the agreement.

### BACKGROUND FACTS

On February 13, 1990, the Drexel Burnham Lambert Group, Inc. (Group) filed a voluntary petition for relief under Chapter 11. Subsequent to the filing of the Group petition, Drexel Burnham Lambert Incorporated (Inc.), a direct subsidiary of Group, and seventeen other entities, filed for Chapter 11 relief. The Debtors continue to operate their businesses and manage their properties as debtors in possession under 11 U.S.C. §§ 1107(a) and 1108.

Prior to 1989, the Debtors employed approximately 10,200 persons. When Group filed its Chapter 11 petition, the approximate number of Drexel employees totalled 5,500 persons. After the petitions were filed, Debtor recognized that to minimize losses, it was necessary to further decrease the size of its work force to reduce the related costs of wages, salaries, office space and other overhead. Currently, there are approximately 200 employees.

Many thousands of complex transactions in which Debtor engaged pre-petition have created an unquantifiable pool of contingent assets (Contingent Assets) and contingent liabilities (Contingent Liabilities), all of which need to be resolved in the context of the bankruptcy proceedings. The Contingent Assets, which cannot be precisely identified or valued, may include claims for preferences and fraudulent transfers, claims for corporate opportunities, claims against certain partnerships, and breach of fiduciary obligation claims against former employees. Similarly, the Debtors need to resolve over $3 billion in Contingent Liabilities that have been asserted against it.

Debtor claims that its ability to recover Contingent Assets and defend successfully against the Contingent Liabilities is dependent upon the cooperation and assistance of Joseph. Drexel's assertion that Joseph possesses vital historical information necessary to successfully defend against Contingent Liabilities and pursue Contingent Assets is bolstered by Joseph's employment history with Drexel. Since 1974, Joseph has served in the capacities of Chief Executive Officer of Inc., as a member of the Boards of Directors of Group and Inc., and as a member of the Executive Committees of Group and Inc. Currently, Joseph serves as Senior Executive Vice President of Inc. and Vice Chairman of the Board of Directors of Group.

Standing in the way of Drexel's harmonious relationship with Joseph are: i) Debtor's asserted claims that Joseph mismanaged the Corporation; ii) Joseph's claims that Drexel breached an employment contract, dated July 5, 1989, between Joseph and Group, which provided, *inter alia*, that in the event Joseph's duties were to change from those of President and Chief Executive Officer of Group and Inc., he would be entitled to a claim for a cash payment in an amount of three times his annual compensation; and iii) Joseph's objections to the disclosure of attorney-client confidences.

### THE PROPOSED SETTLEMENT & CONSULTING AGREEMENT

Under the settlement and consulting agreement (Joseph Settlement) Drexel and Joseph are willing to give up their respective claims against each other in exchange

---

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general reference to this Court, dated July 10, 1984 (Ward, C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes conclusions of law under F.R.Civ. P.Rule 52 as made applicable by Federal Rules of Bankruptcy Procedure Rule 7052.

for Joseph's aid in tracking down assets and defending claims on behalf of the estate. Specifically, Drexel agrees to release its claims against Joseph for (i) Joseph's acts or omissions in his capacity as employee, officer, trustee or director; and (ii) any compensation previously paid to Joseph. In return, Joseph agrees to waive certain claims against Drexel including his $9 million termination payment or "golden parachute" claim.[2] Joseph, however, does not give up his claims as an equity security holder, indemnification for unreleased claims, health benefits, and ordinary accrued severance claims. Nor does Drexel release all of its rights to the extent necessary to expunge excess payment under entity by law rights.

Joseph also agrees to resign his current position as Senior Executive Vice President of Inc. and Vice Chairman of the Board of Directors of Group by the end of 1991.[3] Joseph is currently compensated at a rate of $375,000 per year. Once Joseph has resigned, he will be retained as consultant and advisor to Drexel in connection with the resolution of the Contingent Assets and Contingent Liabilities claims.[4] Joseph will receive $350,000 for consulting services during the first year. If Joseph's services are renewed for a second year, he will earn $325,000. If his services are not renewed, he is guaranteed $225,000. Joseph is also entitled to receive $207,000 in severance pay. Consequently, the Consulting Agreement contemplates that Joseph will receive at a minimum, $782,000 for one year of service, or $882,000 for two years of service.

The Joseph Settlement impacts on a separate settlement between Joseph and the Pooling Claimants (Pooling Settlement).[5] The Pooling Settlement is contingent upon this Court's approval of the Joseph Agreement. Pooling Claimants have asserted claims against Joseph in his capacity as a control person. The Pooling Settlement requires that Joseph would, without admitting any liability, satisfy potential claims of the Pooling Claimants with proceeds from a directors and officers policy ("D & O policy") in the amount of $3,000,000. He would then be released from all other potential claims by the Pooling Claimants. The Pooling Settlement, however will not be effective unless Drexel authorizes the D & O insurance carrier to release the money on behalf of Joseph.

Former Drexel directors and officers, Michael Milken, Kevin Madigan and Charles Thurnher, co-insureds under the D & O policy all object to the proposed consulting and settlement agreement, allege they will be more exposed financially because the $10 million indemnity fund will be reduced by a third. More significantly, under the consulting arrangement, Joseph will be aiding Drexel and its agent, the Pooling Counsel, in recovering assets for the benefit of the estate. Potentially, assets are recoverable from Milken, Madigan and Thurnher. The D & O policy does not, however, cover self-serving conduct. Thus, Joseph will be in a position to reveal evidence, if it exists, that may disallow indemnity coverage for other former directors and officers leaving them even more financially exposed.

**2.** Some portion of Joseph's termination claim may be entitled to administrative expense status because Joseph was employed post-petition. For a more detailed discussion on the treatment of employment executory contracts and administrative expense status, see *Sol Cohen v. Drexel Burnham Lambert*, Adv.Pro., unpublished 1991.

**3.** The Consultation Agreement specifically contemplates Joseph's simultaneous exchange of duties upon Court approval of the agreement. Nevertheless, Drexel maintains that Joseph is resigning his various posts regardless of the outcome of this Court's ruling by the end of 1991. Thus, Drexel claims the consulting agreement is necessary to retain the services of Joseph.

**4.** Joseph will not provide any consulting services for the direct benefit of Newco, the restructured entity surviving Drexel.

**5.** The Pooling Claimants consist of the Federal Deposit Insurance Corporation (FDIC), the Resolution Trust Corporation (RTC) and the law firm of Milberg, Weiss, Bershad, Specthrie & Lerach, as attorneys for various class and derivative plaintiffs (Milberg, Weiss). See, Debtors filed but unapproved First Amended and Restated Disclosure Statement, filed December 5, 1991. See also, *Securities and Exchange Commission v. Drexel Burnham Lambert Incorporated (In re The Drexel Burnham Lambert Group, Inc.)*, 130 B.R. 910 (S.D.N.Y.1991).

Milken, Madigan and Thurnher, object to the Joseph Agreement by attacking its fairness and reasonableness. The primary objections do not focus on the Joseph Agreement per se, but on this Court's approval of the release of $3 million by the D & O insurance carrier. Once the proposed payment is made, the amount of coverage available for the protection of other insureds under the D & O policy is reduced to $7 million. Thus, the objectants argue, the release of money for the benefit of Joseph alone is inequitable.

Specifically addressing the Joseph Agreement, Milken asserts Debtors are abandoning claims against Joseph for mismanagement, breach of fiduciary duty, and corporate waste. Additionally, Milken asserts that Joseph is already bound to aid Drexel, or can be compelled to do so through ordinary service of process. Thus, Milken argues Debtors are paying for services they already have.

Madigan and Milken both argue that the Joseph Agreement is not arm's length because Joseph negotiated this settlement with Weil, Gotshal, the very law firm that represented Joseph in his 1989 employment agreement with Drexel and in the government investigations of Drexel.[6]

Lastly, Madigan does not want this Court to bless the provision in the settlement agreement that protects the D & O insurance carrier, National Union Fire, against possible future claims for bad faith or improper conduct.

### SETTLEMENT STANDARD

■ The Bankruptcy Court derives its authority to approve settlements from F.R.Bkrtcy.P.Rule 9019(a). The Rule provides that "on motion by the trustee and after a hearing on notice to creditors ... the court may approve a compromise or settlement." F.R.Bkrtcy.P.Rule 9019(a). Compromises may be effected separately during reorganization proceedings or in the body of the reorganization itself. *In re Public Service Co.*, 114 B.R. 820, 827

(Bkrtcy.D.N.H.1990), *stay denied, In re Public Service Co.*, 116 B.R. 347 (Bkrtcy. D.N.H.1990); *see also, In re AWECO, Inc.*, 725 F.2d 293 (5th Cir.1984), *reh. denied, In re AWECO, Inc.*, 732 F.2d 941 (5th Cir. 1984), *cert. denied, AWECO, Inc. v. United States*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

The Supreme Court set forth the standard a Bankruptcy Court should follow in determining whether or not it should approve a compromise agreement in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), *reh. denied, Protective Committee for Independent Stockholders etc. v. Anderson*, 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968), *on remand, TMT Trailer Ferry, Inc. v. Kirkland*, 471 F.2d 10 (5th Cir.1972). The Court required that the Bankruptcy Court make an informed, independent judgment as to whether a settlement is "fair and equitable" and "in the best interests of the estate." *Id.* at 424, 88 S.Ct. at 1163; *In re International Distribution Centers, Inc.* 103 B.R. 420, 422 (S.D.N.Y.1989).

■ A Bankruptcy Court, however, need not conduct an independent investigation in formulating its opinion as to the reasonableness of a settlement. The Court can give weight to the Trustee's informed judgment that a compromise is fair and equitable. *See, In re Carla Leather, Inc.*, 44 B.R. 457, 11 CBC.2d 622 (Bkrtcy. S.D.N.Y.1984), *aff'd, In re Carla Leather, Inc.*, 50 B.R. 764, 13 BCD 650, CCH Bkrtcy. L.Rptr. ¶ 70,640 (S.D.N.Y.1985). The Court can also give weight to the competency and experience of counsel who support the settlement. *In re Texaco, Inc.*, 84 B.R. 893, 17 BCD 483, CCH Bkrtcy.L.Rptr. ¶ 72,235 (Bkrtcy.S.D.N.Y.1988).

■ Moreover, a trial or "mini trial" on the merits is not required for Court approval of a settlement. *In re Blair*, 538 F.2d 849, 851 (9th Cir.1976). The Court's re-

---

**6.** Weil, Gotshal's representation of Joseph in these matters is the basis of Joseph's attorney-client privilege claim.

sponsibility is "to canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *See e.g., In re W.T. Grant, Co.,* 699 F.2d 599, 608 (2d Cir.1983), *cert. denied, Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir.1983).

Courts look to several factors which shed light on whether the compromise remains above the lowest point in the range of reasonableness. In determining whether a settlement is "fair and equitable," *i.e.,* within the range of reasonableness, Courts should balance:

a) the likelihood of success compared to the present and future benefits offered by the settlement;

b) the prospect of complex and protracted litigation if settlement is not approved;

c) the proportion of the class members who do not object or who affirmatively support the proposed settlement;

d) the competency and experience of counsel who support settlement;

e) the relative benefits to be received by individuals or groups within the class;

f) the nature and breadth of releases to be obtained by officers and directors; and

g) the extent to which settlement is the product of arm's length bargaining.

*See, In re Texaco,* 84 B.R. 893, 17 BCD 483, CCH Bkrtcy.L.Rptr. ¶ 72,235 (Bkrtcy. S.D.N.Y.1988); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 24 CBC.2d 611 (Bkrtcy.S.D.N.Y.1990).

## DISCUSSION

■ After reviewing the applicable criteria, this Court is convinced that the Joseph Agreement is above the lowest point in the range of reasonableness, and is fair and equitable and in the best interest of the estate. First, Joseph's 17–year employment history uniquely positions him to provide services as consultant, advisor, strategist, fact finder and historian in connection with the prosecution of the Contingent Assets and defense of the Contingent Liabilities. Initially, Joseph will be assigned the review, analysis and factual development of more than 40 proofs of claims filed against Debtors, totalling in excess of $1.3 billion in liabilities. Joseph is positioned to evaluate these claims because of his knowledge of both the transactions and the participants involved. Joseph is equally qualified to assist in evaluating and analyzing Contingent Assets which could net millions for the benefit of the estate.

Second, Debtors have no control over Joseph and are confronted with the issue of how to retain Joseph's services.[7] Absent this agreement, Joseph intends to leave Drexel and find employment elsewhere. While Joseph is duty bound to aid Debtors in defense of Contingent Liabilities and pursuit of Contingent Assets,[8] or could be made to do so through Subpoena, Drexel would benefit more if Joseph were employed full time than were he merely available on weekends. Perhaps more aptly, it is better to have a compensated "volunteer" than a coerced defendant/employee.

Third, the releases contemplated by Drexel and Joseph can be independently justified. They need not be tied to the consulting agreement. Drexel proposes to release Joseph for Joseph's acts or omissions in his capacity as employee, officer, trustee or director. In turn, Joseph agrees to waive certain claims against Drexel including his $9 million termination payment or "golden parachute" claim. When we balance Drexel's litigation costs associated with prosecuting its mismanagement claim

---

**7.** For example, in February 1991, Drexel lost the employment services of Herbert Bachelor, former head of Drexel's Corporate Finance Department, who was knowledgeable about corporate finance department partnerships and related transactions.

**8.** *See e.g., Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 352–53, 105 S.Ct. 1986, 1993, 85 L.Ed.2d 372 (1985) (the role of a debtor's directors "is to turn over the corporation's property to the trustee and to provide certain information to the trustee and to creditors" to enable the trustee to "investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors").

and defending against the termination claim, the fact that Joseph's individual net worth is $3.11 million, and recognizing that some portion of the termination claim may be entitled to administrative claim status, we are satisfied that on this issue, there is a *quid pro quo* that makes the settlement fair and reasonable and in the best interest of the estate.

Fourth, the Joseph Agreement survived the independent and careful scrutiny of the Official Committees appointed to protect the interests of creditors and shareholders of these chapter 11 estates. The Joseph Agreement also survived the scrutiny of Pooling Counsel, who have been given the responsibility of pursuing certain claims by the estate. Lastly, the Joseph Agreement survived the scrutiny of Debtors' Board of Directors. Although the Board is not as detached or disinterested as those groups mentioned above, this Court is satisfied with the objective criteria the Board used in negotiating and approving the Joseph Agreement.

The Board considered: i) the material benefits to the estate both in terms of the release by Joseph, and his assistance in defending the Contingent Liabilities and prosecuting the Contingent Assets; ii) the fact that Joseph has no interest in any of the "corporate finance" or "high-yield" partnerships which are the subject of possible claims by Debtors; iii) the fact that Joseph is not a potential target of a claim by Debtors based upon his 1989 bonus because Joseph received his entire 1989 bonus in preferred stock of Group, which may turn out to be worthless; iv) facts available to Debtors do not indicate Joseph acted in bad faith or for personal gain; v) Debtors are not aware of any form of willful misconduct; and, vi) Joseph has consistently been willing to make himself available for testimony to both the S.E.C. and the U.S. Attorney's Office, without a grant of immunity.

Fifth, the payment by National Union also appears reasonable in light of the case law too numerous to be cited that imposes a duty to settle. Conversely, to impose a duty upon an insurer to ascertain all claims under a policy before settling any claims, and to require the insurer to settle individual claims at its peril is contrary to the policy of encouraging compromise and speedy settlement, *see Harmon v. State Farm Mutual Auto. Ins. Co.*, 232 So.2d 206, 207–208 (Fla.App.1970), and turns legal common sense on its head. The insurance law of New York is to the same effect. *See, Gerdes v. Travelers Ins. Co.*, 109 Misc.2d 816, 440 N.Y.S.2d 976, 978 (1981) (one claimant cannot prevent another from settling just because the settlement might diminish or exhaust the insurance proceeds.); *Standard Accident Ins. Co. of Detroit Mich. v. Winget*, 197 F.2d 97 (9th Cir.). Finally, we have to assume that National Union is settling in good faith. They have a duty to do so, and there are no affirmative allegations they are not doing so.

Sixth, we find no conflict because Joseph was represented by Weil, Gotshal in his 1989 employment with Drexel and in the government investigation of Drexel. The conflict was disclosed by Weil, Gotshal. But more importantly, we have to look at the nature of the negotiation and the agreement. More parties negotiated this sole agreement than would be seen in a small Chapter 11. We are hard pressed to see what advantage would have been gained by anyone.

Lastly, this agreement was negotiated by Debtors with an insider. We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable.

Thus, after reviewing the entire settlement and consulting agreement, which provides for the mutual release of claims and the employment of Joseph for the single purpose of increasing the distribution available to creditors, in the exercise of our discretion, we find that the Joseph agree-

ment is fair and reasonable and in the best interest of the estate.

Counsel for Drexel is to settle an order.