**In re HYLOFT, INC., Debtor.**

**No. 10–13300–MKN.**

United States Bankruptcy Court,
D. Nevada.

May 25, 2011.

Ambrish S. Sidhu, Sidhu Law Firm, Las Vegas, NV, for Debtor.

Yvette Weinstein, Las Vegas, NV, Trustee.

## ORDER ON MOTION TO APPROVE ASSET PURCHASE AND COMPROMISE OF CLAIMS[1]

MIKE K. NAKAGAWA, Bankruptcy Judge.

The Motion to Approve Asset Purchase and Compromise of Claims was heard on October 20, 2010. The appearances of counsel were noted on the record. After oral arguments were presented, the matter was taken under submission.

## BACKGROUND[2]

HyLoft, Inc. ("Debtor") filed a voluntary Chapter 7 petition on March 1, 2010. The

---

1. In this Order, all references to "Section" shall be to the provisions of the Bankruptcy Code, 11 U.S.C. § 101, et seq. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure.

2. "Dkt#" refers to the number of the filed document as it appears on the ECF docket for this bankruptcy case. "Adkt#" refers to the number of the filed document as it appears on the docket for the relevant adversary proceed-

petition was signed by Michael Mikich ("Mikich"), in his capacity as President of the Debtor. Yvette Weinstein was appointed as the Chapter 7 trustee ("Trustee") to administer the case.

Apparently, Debtor ceased business operations in December 2009. Prior to that, Debtor was in the business of selling overhead storage products, such as shelves and lofts. Debtor owned a number of patents and patent applications ("Patents") that it used to manufacture these overhead storage products, which it sold through large retail stores and independent dealers. The Debtor's Statement of Financial Affairs lists its officers and directors, along with the percentage of respective stock ownership as follows: Dwayne Dunseath ("Dunseath") (23.2%); Mark Torosian ("Torosian") (20.1%); Timothy M. Matthias (15.5%); Ken Newby, LLC (15%); Mikich (14.6%); and Daniel Coletti ("Coletti") (7%). (Dkt# 11 at 32).[3]

Five years prior to the commencement of the case, the Debtor obtained a loan from City National Bank ("CNB") in the amount of $500,000.[4] In 2007, Debtor obtained an additional loan from CNB in the amount of $1,000,000 (collectively, the "Bank Loans"). The Bank Loans were secured by Debtor's assets, including but not limited to, its Patents.

In April 2007, Debtor apparently transferred some of its Patents to KE Investments ("KEI").[5] Debtor then entered into a licensing agreement with KEI, providing Debtor with exclusive rights to use the transferred Patents (the "KEI Licensing Agreement"). (Dkt# 19, Ex. N). The KEI Licensing Agreement was signed on behalf of KEI by Coletti. The Agreement references an attachment identifying the Patents transferred; however, that attachment has not been included in the pleadings. The consideration to be paid to KEI under the KEI Licensing Agreement was based on a monthly percentage of Debtor's gross sales using the Patents.

According to Mikich, KEI was expressly formed based on the tax advice of Debtor's accountant, who recommended the formation of a separate limited liability company to hold the Debtor's intellectual property assets ("IP Assets") for tax purposes. (Dkt# 222). In fact, KEI possesses the same ownership and shareholder structure as the Debtor, and as such, Mikich also was a member of KEI until sometime in September/October 2010.[6] This corporate structure seemingly was proposed by Coletti and approved by the Debtor's share-

---

ing. Where appropriate, references to a document's page number will be made.

**3.** The Statement of Financial Affairs also lists four individuals or entities whose relationship with the Debtor has terminated within the year preceding the filing of the bankruptcy petition. This list includes Dwayne Dunseath, Ken Newby, LLC, Gene Newby and Blake Down, all of whom are listed as terminated as of January 22, 2010. (Dkt. 11 at 33). As such, Dwayne Dunseath is no longer a Director of the Debtor but may still be a shareholder.

**4.** The lender on the 2005 loan was Business Bank of Nevada, CNB's predecessor-in-interest by merger.

**5.** It is not clear whether there is a separate agreement between the Debtor and KEI memorializing this transfer of assets. If the KEI Licensing Agreement is meant to also be the transfer agreement, it does not recite the consideration exchanged for the transfer of the Patents. However, in his affidavit to his Motion for Relief from the Automatic Stay ("RAS Motion"), Mikich states that the Debtor agreed to assign the Patents to KEI for a contractual obligation of $3,693,509. (Dkt# 5 at 19).

**6.** Mikich also indicated that he believed that Matthias and Torosian, members of KEI, had transferred their interests in KEI to Coletti. (Dkt# 217, Ex. 4 at 32).

holders on March 14, 2007. (Dkt# 222, Ex. 1–2 at 5).

In June 2009, Debtor defaulted on the Bank Loans by failing to pay the loan when it came due on June 15, 2009.[7] On or about July 17, 2009, KEI sent the Debtor a 90–day notice of termination for cause ("Termination Notice") as to the KEI Licensing Agreement. (Dkt# 19, Ex. O at 5).[8] Sent to the attention of Debtor's Board of Directors, the Termination Notice was signed by Mikich in his capacity as Manager of KEI.

In November 2009, CNB commenced an action in the Eighth Judicial District Court for Clark County, Nevada ("State Court") against Debtor and the personal guarantors on the Bank Loans, including Dunseath and Mikich ("CNB Litigation").[9] CNB quickly obtained a temporary restraining order, followed by a writ of possession ("Writ") against the Debtor's assets on November 24, 2009. (Dkt# 16, Ex. C, Part 5 at 43). The Writ prohibited the Debtor, its officers and employees from using, transferring or dissipating Debtor's assets pending seizure by the sheriff to be turned over to CNB. *Id.*

Between CNB's filing of the litigation in State Court and obtaining the Writ in state court, on November 16, 2009, KEI sent Debtor an official notification of the termination for cause as to the KEI Licensing Agreement. (Dkt# 19, Ex. O at 2). KEI then granted the exclusive use to the Patents to Diamond Storage Concepts LLC d/b/a Diamond Square Concepts, LLC ("Diamond Storage").[10] (Dkt# 19 at 5). Diamond Storage is owned and/or controlled by Coletti. (Dkt# 30).

Some time in December 2009, CNB sold the Bank Loans and transferred all of its rights and interests in the Debtor's assets to International Technical Coatings, Inc. ("ITC"). As CNB's successor-in-interest, ITC filed an amended complaint in the CNB Litigation on January 6, 2010, on breach of contract claims and seeking to obtain assets it alleged Debtor's principals took after the state court issued the Writ to CNB in November 2009.[11] (Dkt# 16, Ex. C, Part 2 at 2).

After ITC filed its amended complaint, Mikich obtained a personal loan from Co-

7. At that point, the Debtor had entered into two change in term agreements and a forbearance agreement with CNB which had extended the maturity date on the loan until June 15, 2009. (Dkt# 85, Ex. 9 at 28). When Debtor failed to pay the loan in full on the maturity date, CNB sent Debtor and each personal guarantor a Demand for Payment letter on October 8, 2009. *Id.*

8. The letter advised Debtor that it had come to KEI's attention that Debtor was insolvent and was in imminent danger of not being able to fulfill its customers orders. Based on Debtor's past performance and current business condition, KEI gave Debtor 90 days notice of termination of the licensing agreement. (Dkt# 19, Ex. O at 5).

9. That case is denominated A–09–603087–B and was filed in the Eighth Judicial District Court for Clark County, Nevada ("State

Court"). Coletti was not initially named a defendant in the CNB lawsuit as he was not a personal guarantor on the Bank Loans.

10. According to Mikich's Declaration in support of his RAS Motion, this termination gives KEI a damages claim against the Debtor for $3,000,000.

11. The Amended Complaint filed by ITC included additional defendants, including Coletti and Diamond Storage. The complaint alleged, among other things, that Mikich and Coletti formed Diamond Storage Concepts with illegally transferring Debtor's assets by theft to DSC's facilities for use by DSC, transferring Debtor's proprietary business information and using this information to obtain former HyLoft customers. ITC also sought an order to show cause ("OSC") why Mikich and Coletti should not be help in contempt for violating the court's prior orders.

letti and/or DBPB, for the specific purpose of paying ITC the Bank Loans in full. Once he obtained the funds, Mikich tendered two checks to ITC, dated January 25, 2010, for a total amount of $1,300,000.[12]

On the same day—January 25, 2010—Mikich and DBPB Acquisitions, Inc. ("DBPB") entered into a security agreement with Debtor ("Mikich/DBPB Agreement"). (Dkt# 19, Ex. I at 2). DBPB is owned and/or controlled by Coletti. Under the Mikich/DBPB Agreement, in exchange for paying off the Bank Loans to ITC, Debtor granted Mikich and DBPB a security interest in all the Debtor's assets. Mikich signed the Mikich/DBPB Agreement on behalf of Debtor and on his own behalf as a secured creditor of Debtor; Coletti signed the Mikich/DBPB Agreement on behalf of DBPB. Also on January 25, Mikich and DBPB filed a UCC Financing Statement with the Secretary of State for the State of Nevada, for "all assets" of the Debtor. (Dkt# 19, Ex. J at 2).

Subsequent activity in the CNB Litigation ensued. On February 19, 2010, Dunseath filed a derivative crossclaim ("Crossclaim") on behalf of himself and the Debtor against Mikich, Coletti and Diamond Storage (the Crossclaim, including the CNB Litigation, are referred to collectively as the "State Court Litigation").[13] (Dkt# 16, Ex. B). In the Crossclaim, Dunseath asserted a number of causes of action against Mikich, Coletti, Diamond Storage and KEI, alleging among other things,

fraudulent activity, fraudulent conveyance, civil conspiracy, conversion, breach of fiduciary duties, breach of contract, and breach of implied covenant of good faith and fair dealing against the Debtor. Dunseath also sought to have a receiver appointed in the case.

On March 1, 2010, on the eve of the hearing to appoint a receiver, Debtor filed its bankruptcy petition. Four weeks later, the Trustee removed the State Court Litigation to the bankruptcy court. (Dkt# 16 and 85). In his capacity as creditor, Mikich filed a Motion to Dismiss the State Court Litigation ("Dismissal Motion") and then filed a Motion to Remand ("Remand Motion") the case back to State Court. (Dkt# 28, 33). Coletti, jointly with Diamond Storage, filed a joinder to Mikich's Dismissal Motion.[14] (Dkt# 30).

On September 17, 2010, the Trustee filed a Motion to Approve an Asset Purchase and Compromise of Claims ("Settlement Motion") (Dkt# 204), pursuant to FRBP 9019(a), accompanied by the supporting affidavit of the Trustee. ("Trustee Declaration") (Dkt# 207). Mikich filed a joinder to the Settlement Motion, accompanied by the supporting declaration of Mikich. (Dkt# 221, 222). Creditors Xinguang Technology Co. Ltd. of Sichuan Province and HeSheng Hardware Products Co. (jointly, the "Equipment Suppliers") and Dunseath, in the capacity of creditor, filed opposition, accompanied by the supporting declaration of Brian

---

**12.** Apparently, Mikich tendered more than the amount due under the Bank Loans due to disagreements with ITC as to the remittance. At the beginning of February 2010, Mikich sought and obtained a Writ in state court for the Debtor's assets in ITC's possession. (Dkt# 19 at 4). Accordingly, Mikich asserts that he is in possession of some of the assets, which he states are being held in storage.

**13.** Dunseath also filed a Derivative Third-party Complaint, on behalf of himself and as Third Party Plaintiff for Debtor against Edward Lower, former President of Debtor, KEI, DSC Management LLC, Acquisition Facilitator, LLC, DBPB, and Home Installation Services, LLC. (Dkt# 16, Ex. B).

**14.** There was no declaration or affidavit accompanying Coletti's Joinder to Mikich's Motion to Dismiss the State Court Litigation.

Shapiro, counsel to the Equipment Suppliers. (Dkt# 215, 216).[15] The Trustee filed a reply to the Equipment Suppliers and to Dunseath (Dkt# 223), along with a supplemental declaration. ("Supplemental Trustee Declaration") (Dkt# 224). Oral arguments were presented at a hearing conducted on October 20, 2010.[16]

## APPLICABLE LEGAL STANDARDS

■ The Trustee seeks approval of the Settlement under FRBP 9019. A settlement may be approved if it is fair and equitable when comparing the claims being compromised against the likely rewards of litigation. *See generally Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Moreover, "[w]hen assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues." *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (9th Cir. BAP 1997). Otherwise, there would be no point in reaching a settlement, and the parties may as well try the case. *See Suter v. Goedert*, 396 B.R. 535, 548 (D.Nev.2008).

■ In approving a compromise, the court is directed to consider (1) the probability of success in litigation of the dispute, (2) the difficulties to be encountered, if any, in the collection of an award, (3) the complexity, expense, inconvenience and delay of litigation, and (4) the interest of creditors in the case, giving deference to any reasonable views expressed. *See In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir.1986). The party seeking approval of a compromise has the burden of persuasion. *Id.*

■ In deciding whether to approve a proposed settlement, the bankruptcy court must make an informed decision. *See In re Churchfield*, 277 B.R. 769, 773 (Bankr. E.D.Cal.2002). The trustee's business judgment is not alone determinative of the issue of court approval; the "court is not permitted to act as a mere rubber stamp" but must make an independent determination that the compromise is fair and equitable. *See In re Rake*, 363 B.R. 146, 152 (Bankr.D.Idaho 2007). *See also Matter of Foster Mortgage Corp.*, 68 F.3d 914, 918 (5th Cir.1995); *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir.1988); *In re Adelphia Communications Corp.*, 327 B.R. 143, 158–59 (Bankr.S.D.N.Y.2005).

■ The proponent of the settlement must persuade the court that the settlement is in the best interests of the estate. *See Goodwin v. Mickey Thompson Entertainment Group. (In re Mickey Thompson Entertainment Group, Inc.)*, 292 B.R. 415, 420–21 (9th Cir. BAP 2003). The trustee must demonstrate more than a "mere good faith negotiation of the settlement" because the court must independently make a finding that the compromise is reasonable, fair and equitable. *See In re Casimi-*

**15.** There was no declaration or affidavit accompanying Dunseath's Opposition to the Settlement Motion.

**16.** There were additional status hearings held by the court concurrently with the Settlement Motion on Mikich's Motion to Dismiss the Adversary Proceeding (Adkt# 6), Mikich's Motion to Dismiss the bankruptcy case (Dkt# 28); Mikich's Motion for Remand the Adversary Proceeding (Adkt# 33) and Mi-

kich's Motion for Relief from Stay (Dkt# 17). However, at the conclusion of the hearing on the Settlement Motion, the court confirmed with the parties that the remaining motions would only need to go forward depending on the outcome of the Settlement Motion. Thus, the court reserved the ability to enter appropriate orders as necessary as to the remaining status hearing matters upon resolution of the Settlement Motion.

ro, 2007 WL 1577947 at *4 (Bankr. E.D.Cal.2007), *citing In re A & C Properties, supra,* 784 F.2d at 1381. *See also Mickey Thompson, supra,* 292 B.R. at 420–21.

■ The trustee must show that he or she made an "informed judgment after diligent investigation." *Kowal v. Malkemus (In re Thompson),* 965 F.2d 1136, 1145 (1st Cir.1992). One court has observed:

At times, trustees' Rule 9010 motions seem to do little more than recite the trustees' belief that the proposed settlement is fair and offer a general statement that the several *A & C Properties* factors are met. Trustees must do more than parrot the standards or announce that they are satisfied. Their burden is to 'persuad[e] the bankruptcy court that the compromise is fair and equitable and should be approved.' *A & C Properties* at 1381. Thus, they must present a cogent and detailed factual explanation, discussing how the factors apply to the specific litigation and proposed settlement. *Id.* at 1383 (requiring a 'sufficient factual foundation' that a compromise or settlement is fair and equitable). To tolerate less would make the Court into a rubber stamp, allowing the trustee's evaluation to be determinative. The cases, of course, call upon the Court to make the ultimate judgment.

*In re Olson,* 2006 WL 2433448 at *2 n. 8 (Bankr.D.Idaho 2006). *See also In re Marples,* 266 B.R. 202, 206 (Bankr.D.Idaho 2001).

Some courts rely heavily on the trustee's judgment, leaving the court to only analyze whether the trustee has shown that the settlement is reasonable. *See In re Churchfield, supra,* 277 B.R. at 773–74 ("The opinion of the trustee is entitled to great weight [but] the bankruptcy court [still] has a duty to make an informed, independent judgment as to the reason-

ableness of the proposed compromise."); *In re Ashford Hotels, Ltd.,* 226 B.R. 797, 802 (Bankr.S.D.N.Y.1998) (court should not substitute its judgment for the trustee but only test the reasonableness of the trustee's proposal); *In re 110 Beaver Street Partnership,* 244 B.R. 185, 187 (Bankr.D.Mass.2000) (Courts will defer to a trustee's judgment provided the trustee demonstrates the compromise is reasonable and not an abuse of his discretion); *In re Adley,* 333 B.R. 587, 608 (Bankr. D.Mass.2005) (In deciding whether to approve proposed compromise, bankruptcy court "should avoid second-guessing a trustee in the exercise of his business judgment.").

In certain circumstances, however, some courts give minimal deference to the trustee's business judgment. *See, e.g., Simantob v. Claims Prosecutor, LLC (In re Lahijani),* 325 B.R. 282, 289 (9th Cir.2005) (the trustee's proposed settlement did "not inspire confidence in his business judgment."); *In re C.R. Stone Concrete Contractors, Inc.,* 346 B.R. 32, 49–50 (Bankr. D.Mass.2006) (trustee's groundless determination was made after interviewing only four witnesses, three of whom were named as defendants in debtor's complaint). Courts often consider the competency and experience of the trustee when determining the degree of deference to allot to the trustee's judgment. *See Ashford Hotels, supra,* 226 B.R. at 803.

## DISCUSSION

The objections to the Trustee's motion will be discussed in the context of the applicable factors for approving a compromise.

### A. The Proposed Settlement Agreement.

Under the Asset Purchase Agreement and Compromise of Claims ("Proposed

Settlement Agreement"), the Trustee seeks to assign her rights and claims on behalf of the bankruptcy estate ("Estate") to Red Valley Acquirement, LLC ("Red Valley"), settle claims on behalf of the Estate in connection with the State Court Litigation, and sell the Debtor's assets to Red Valley for $120,000.[17] Red Valley is owned and/or controlled by Coletti.[18] The sale contemplates Red Valley's purchase of all the Debtor's assets,[19] with the exception of two particular assets. The first asset excluded from the Proposed Settlement Agreement is the Debtor's accounts receivables still owed at the commencement of its bankruptcy case (with the exception of the asset discussed in the next paragraph), for inventory that was sold pre-petition by Debtor to customers, and including pro-

ceeds from these receivables collected post-petition by the Trustee. Attached to the Proposed Settlement Agreement is a list of accounts receivables believed to be owed to the Debtor as the time of the bankruptcy petition. (Dkt# 204 at 31). This exhibit provides a total of approximately $227,966.82, which under the Proposed Settlement Agreement, would be excluded from the purchase.

However, the Proposed Settlement Agreement expressly excludes any receivables or proceeds owed to Debtor by KEI ("KEI Receivables"). Instead, the KEI Receivables are specifically included in the sale of Debtor's assets to Red Valley. This ostensibly includes any money owed to Debtor for the value of the patents transferred in 2007.

17. After the Settlement Motion was taken under submission, the Trustee and Mikich filed Joint Application to Sever Inventory Asset Purchase From Motion to Approve Asset Purchase and Compromise of Claims and Approve Inventory Asset Purchase ("Severance Motion") (Dkt# 259), along with a supporting declaration from the Trustee. (Dkt# 260). By the Severance Motion, the Trustee and Mikich asked the court to sever and approve Red Valley's purchase of the inventory in the Settlement Motion for $20,000. The Inventory includes 2004 Ford delivery van; new inventory; shop equipment; miscellaneous office and miscellaneous items; and items contained in an outdoor storage area. Creditor Mark Heffner ("Heffner") filed a limited opposition (Dkt# 267), to which the Equipment Suppliers joined (Dkt# 269) and then filed their own opposition. (Dkt# 270). Heffner objected that the inventory included 240 boxes of office files, miscellaneous file cabinets, miscellaneous computers, 2 pallets of business files, 23 boxes of office supplies and old computer units that might include records and information required to investigate the disputed transactions. Heffner previously filed a proof of claim as a nonpriority unsecured creditor in the amount of $500,000 allegedly based on a promissory note. The Equipment Suppliers had the same concerns, but did not otherwise object to the severance

and sale of the inventory. The court approved the Severance Motion on the condition that the business records and computers be preserved, and an order was entered on April 19, 2011. (Dkt# 327).

18. Red Valley was specifically formed for the purpose of the proposed settlement transaction.

19. The sale of assets will include the following: the rights, title, and interest in and to all tangible assets, inventory, intangibles, trademarks together with the goodwill associated therewith, trade names, patents, intellectual property, copyrights, trade secrets, products in development, concepts, plans, customer lists, vendor lists, computer media, electronic and non-electronic documents and files, rights to inventions under any agreement, beneficial interest under any confidentiality or noncompete agreement, any receivable or proceeds owed to the Estate by KEI, and any claims against the Third Party Defendants under the Code including, but not limited to, all preferential payment claims and all fraudulent transfer claims.

Third Party Defendants are defined in the Proposed Settlement Agreement as Mikich, Coletti, Diamond, KEI, DSC, DBPB, Acquisition and Horne Installation; essentially, all Mikich and Coletti affiliated entities. (Dkt# 204 at 19, ¶ Q).

The second asset excluded from the Proposed Settlement Agreement are funds of the Estate, whether held in bank accounts either by the Estate or the Trustee for the Estate. The Debtor's Schedule B listed a Wells Fargo account containing $2,000. The Trustee has also stated that she is currently holding approximately $20,000 for the Estate. (Dkt# 223 at 5).

In addition to Red Valley's payment of $120,000, Mikich and DBPB respectively will release their security interests in the excluded assets. Mikich and DBPB will withdraw their filed proof of claims (or amend to reflect an amount of $0), thereby releasing any rights to receive a distribution from the Estate. Mikich and DBPB have jointly filed one proof of claim for $1,209,480.08, reflecting a secured amount of $908,868.16 and an unsecured amount of $300,611.92. (POC 23–1).[20]

The settlement also results in the Trustee dismissing, without prejudice, the claims on behalf of the Estate in the State Court Litigation. The Proposed Settlement Agreement states that this provision is "more fully set forth in Exhibit E" to the agreement; however, Exhibit E simply states "Stipulation for Dismissal," and thus does not identify the exact claims the provision is referring to. In addition, the Trustee will withdraw her Opposition to Mikich's Motion to Remand the remaining claims[21] alleged in the State Court Litigation back to state court.

The settlement would also effectuate a mutual waiver and release of claims between the Trustee and Red Valley, Mikich, Coletti, Diamond, KEI and DBPB arising from any matter, including claims that the Trustee could have been brought in the State Court Litigation, relating to the Estate's assets, the Settlement Agreement, or that the Trustee could have raised under Chapter 5 of the Bankruptcy Code (including the avoiding powers). The Trustee also will release any claims she may have had against accounts now owing to Diamond Storage or that may become owing to Diamond Storage. (Dkt# 204 at 25 ¶ 8(a)(1)).

Last, the settlement also provides for the Trustee's assignment of all her right, title and interest in any claims or causes of action on behalf of the Estate to Red Valley, including but not limited to her avoidance claims under the Bankruptcy Code against Mikich, Coletti, Diamond Storage, KEI, and DBPB.[22] (Dkt# 204 at 32, Ex. B).

---

20. However, a condition of the Proposed Settlement Agreement requires that this court make the following specific findings of fact with respect to the Debtor's indebtedness to Mikich and DBPB. This section specifically states:

> *Preservation of Indebtedness.* HyLoft, Inc. is indebted to Mikich and DBPB (the "Indebtedness"). As of the filing of HyLoft, Inc.'s bankruptcy petition, the balance owing on the Indebtedness was $1,209,480.08, subject to a setoff in favor of HyLoft, Inc. in the amount of any excess payment that was made by Mikich to ITC and that Mikich is entitled to recover from ITC. The Indebtedness is secured in its entirety by the Mikich Security Agreement and by a right of subrogation in favor of Mikich to the rights of ITC under the Commercial Security Agreement granted by HyLoft, Inc.

to [CNB]. Those security interests and subrogation rights are valid and enforceable against the Estate. A portion of the Indebtedness is also secured by a valid and enforceable security interest granted by HyLoft, Inc. to Mikich and DBPB in that certain Business Loan Agreement dated February 10, 2010. *It is a condition of this agreement that the court make a finding of the facts contained in this paragraph.*
Emphasis added. (Dkt# 204 at 23, ¶ (5)(g)).

21. Again, the court is not clear as to what claims the Trustee is agreeing to dismiss and as such, what the provision "remaining claims" refers to.

22. The agreement also lists DSC Management, LLC, Acquisition Facilitator, LLC and Horne Installation Services; essentially, all the Mikich and Coletti affiliated entities.

## B. Application of the Settlement Approval Factors.

The Equipment Suppliers [23] and Dunseath [24] object to the Settlement Motion on various grounds, namely that the Trustee is selling the assets for a nominal amount when there is the potential for a larger recovery, and that the Trustee is seeking to release claims against the majority of Debtor's insiders, essentially absolving them from liability for alleged self-dealings and related corporate malfeasance. As to the latter, the objecting creditors believe there are at least three claims that the Trustee can pursue on behalf of the Estate: a potential fraudulent transfer action against KEI, an action against Diamond Storage for its unauthorized use of the Debtor's intellectual property, and a fraudulent transfer action against Mikich and DBPB.

The court, having considered the record and documents filed therein, together with the written and oral arguments and representations of the parties, concludes that the Settlement Motion must be denied.

■ This matter involves several individuals and affiliated entities that the Bankruptcy Code considers to be insiders of the Debtor. *See* 11 U.S.C. § 101(31) (defining an insider of a corporate debtor as including a director, officer, or person in control of the debtor); *Dye v. Brown (In re AFI Holding, Inc.),* 530 F.3d 832, 849 (9th Cir.2008) (the term insider is deliberately an open-ended term, including when "the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties."). Here, the common principals of the Debtor and the affiliated entities currently involved in this Settlement Motion, including Red Valley, are Mikich and Coletti. Mikich has exerted control over the Debtor as its President for approximately the past two years, and longer than that as a shareholder, director and in the capacity of various officer positions. He also signed the bankruptcy petition on behalf of the Debtor. Coletti also is an insider based on his positions as a shareholder and director of the Debtor. Moreover, both Mikich and Coletti signed the Proposed Settlement Agreement on behalf of themselves individually, and the six related affiliate entities. Thus, in reviewing the record and filed documents therein, it is clear that the parties to the Proposed Settlement Agreement, excluding the Trustee, are insiders of Debtor.

■ While insider status alone is not fatal to dealings between a debtor and an insider, the court must scrutinize these dealings more carefully. *See* S.REP. No. 95–989, 95TH CONG., 2D SESS. 25 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor."); H.R.REP. No. 95–595, 95TH CONG., 2D SESS. 312 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5963, 6269 (same); *see generally Fitzger-*

23. Xinguang Technology Co., Ltd. of Sichuan Province Claims 3 and 26 are a nonpriority unsecured claim in the amount of $1,090,282.88 for goods sold and services performed. Claim 26 appears to be a duplicate of Claim 3 but substitutes Brian Shapiro as the contact for notice purposes. HeSheng Hardware Products Co. Claim 25 is a nonpriority unsecured claim in the amount of $360,000 for goods sold and services performed.

24. Dunseath Claim 21 is a nonpriority unsecured claim in the amount of $306,756.69 based on alleged amounts owed to him under his employment contract with Debtor and fees incurred in connection with his derivative claims in the State Court Litigation.

*ald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 884 (9th Cir. BAP 2010) (trustee's sale of the debtor's causes of action on a state court crossclaim against a defendant/insider to that same defendant bears higher scrutiny due to the nature of the parties involved); *Stoumbos v. Kilimnik*, 988 F.2d 949, 959 (9th Cir.1993) ("[w]here the trustee seeks to subordinate a claim arising from the dealings between a debtor and an insider, the court will give the insider's actions rigorous scrutiny.") (internal quotations omitted); *see also Spradlin v. Williams (In re Alma Energy, LLC)*, 2010 WL 4736905, at *5 (Bankr. E.D.Ky.) ("[t]he bankruptcy court must subject the dealings between an insider and a debtor to closer scrutiny."); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 498 (Bankr.S.D.N.Y.1991) (when determining whether a proposed settlement is fair and reasonable under FRBP 9019(a), a bankruptcy court should scrutinize insider agreements more closely than agreements between debtor and non-insider parties).

At this point, it is unclear whether the Trustee would be successful in the State Court Litigation, or in pursuing additional claims on behalf of the Estate, as the Equipment Suppliers urge the Trustee to do. The outcome of any litigation is difficult to predict. Additionally, this court has not been privy to all of documents and evidence filed in the State Court Litigation. That being said, there appears to be some circumstantial evidence lending support to possibly fraudulent, or at the very least questionable activity, of the Debtor's principals leading up its bankruptcy filing.

While the court is not currently in the position to decide whether there, in fact, has been some fraudulent activity or corporate malfeasance, it observes that the transfer of Debtor's Patents to KEI seemingly occurred without providing the Debtor any monetary value for the transfer. Even as Debtor teetered on the edge of defaulting on the Bank Loans and insolvency thereafter, there apparently was no move to collect any value from KEI for the Patents. While it allowed Debtor to continue using the patents for a licensing fee that the Debtor evidently never paid, KEI terminated its licensing agreement with the Debtor just one month after Debtor defaulted on the CNB Bank Loans in June 2009. The principals of KEI, the same principals of the Debtor, made the decision to terminate the KEI Licensing Agreement approximately three months before Debtor was "forced out of business" by the subsequent Writ obtained by CNB in November 2009; KEI then granted these licensing rights to Diamond Storage, another related affiliated entity.

Moreover, the Debtor entered into a security agreement with Mikich, one its principals and DBPB, another affiliated entity, providing these parties all of its assets as collateral, apparently in exchange for paying off the Debtor's Bank Loans. This security agreement was signed by Mikich, ostensibly as both Debtor's secured creditor and on behalf of the Debtor. It appears that only some directors of the Debtor may have approved the Mikich/DBPB Agreement, thus doing so without a proper meeting.[25] There were payments made to Mikich from Debtor's receivables the month prior to the bankruptcy filing. Now these same principals, in the capacity of Debtor's creditors, are seeking to sell the remaining majority of the Debtor's assets to Red Valley, yet another affiliated entity.

---

**25.** *See* Dkt# 270, Ex. B/Ex. 6. This exhibit was attached to the Equipment Suppliers' opposition to the Severance Motion.

Independently viewed, these facts may or may not establish nefarious conduct on the part of the Debtor's principals. Taken together, although certainly not conclusive, these facts may lend some evidentiary support on some of the claims in the State Court Litigation, or even potential avoidance claims that the Trustee may pursue on behalf of the Estate. It is difficult to evaluate the probability of success in litigating the claims when the Trustee has not provided a substantive and specific analysis of the risk factors in pursuing the claims other than it will save the Estate money and be in the best interest of the creditors. However, the court is mindful that even if the Trustee succeeds in the State Court Litigation or subsequent claims, there is no guarantee that such success will lead to a larger recovery for the Estate.[26]

In terms of collection, there has been no evidence presented that collection against the Debtor's principals or related affiliate entities would be an issue. In the Settlement Motion, the Trustee asserts her belief that "collecting a judgment from at least some of the Defendants would be difficult." However, she does not identify which defendant this assertion refers to or the reasoning or evidentiary basis behind this belief. While the court is not privy to the financial situations of the Debtor's principals, it is clear that these individuals are principals of several business entities. Moreover, Coletti was able to provide Mikich a personal loan for approximately $1.3 million dollars. While there is always a risk of difficulties in collecting judgments, it is within the range of reasonableness to infer that collection would not necessarily be an issue against these individuals and/or entities.

Generally speaking, the third factor cuts in favor of settlement. Litigating fraud and/or corporate malfeasance claims may be complex when, as here, there are numerous transactions involving insider entities and documents. It is almost certain that it will take additional time and resources for all parties involved to conduct further discovery, file additional briefs and evidentiary support, and appear before the court, whether in the bankruptcy court or the state court. Therefore, further litigation will incur additional expenses, delay and inconvenience to the parties involved.

On the other hand, some discovery was conducted in the State Court Litigation and numerous affidavits were filed in connection with that litigation. Although the Trustee argued that the opposing creditors had not conducted any discovery as to their alleged claims, the Equipment Suppliers have since conducted several examinations of the parties involved under FRBP 2004. Thus, while certainly not dispositive in concluding that the parties will not incur further expenses or inconvenience, some groundwork has been established.

Last, the court must consider the paramount interest of the creditors. Here, the

---

**26.** Noticeably absent from the Trustee's analysis is whether the claims filed by the various insiders—secured or unsecured—would be subject to equitable subordination under Section 510(c). *See Wilson v. Huffman (In re Missionary Baptist Foundation, Inc.),* 712 F.2d 206 (5th Cir.1983) (equitable subordination under Section 510(c) proper on finding that creditor engaged in inequitable conduct that injured others or gave unfair advantage and that subordination would be consistent with the Bankruptcy Code); *Paulman v. Gateway Venture Partners III (In re Filtercorp, Inc.),* 163 F.3d 570 (9th Cir.1998) (requirement of inequitable conduct beyond initial undercapitalization of a business). Without analysis by the Trustee, the Settlement Agreement releases and transfers claims and rights under Chapter 5 of the Bankruptcy Code, which includes the subordination provisions of Section 510.

Trustee argues that there are only three objecting creditors, and that one of these objecting creditors is an insider. However, removing the claims of Debtor's insiders,[27] including Dunseath, the claims of the Equipment Suppliers comprise approximately 55% of total amount of the claims. Adding Heffner's Objection to the Joint Motion to Sever, the objecting creditors hold 74% of the debt.

More important, it is difficult for the court to completely ascertain whether the settlement will result in the maximum benefit to the Estate and its creditors when there appears to be either missing or inconsistent information provided that is potentially crucial to approving the settlement. No evidence has been presented as to the value of KEI Receivable and whether it is in fact in the Estate's interest to sell this asset to Red Valley without additional information. The Debtor's personal property Schedule "B" states that the value of the KEI receivables is unknown. However, in his affidavit to the RAS Motion, Mikich attests that not only is the KEI Receivable the Debtor's most valuable asset but that at the time he moved for relief from stay, he believed the KEI Receivable to be worth approximately $660,000. (Dkt# 19 at ¶ 29). The basis for this belief is unknown to the court.

Additionally, as previously mentioned, it is unclear to the court exactly what claims the Trustee intends to release in the State Court Litigation. In response to the Equipment Suppliers' same observation, the Trustee asserts that she "is attempting to settle all potential litigation against all of the parties that signed the settlement agreement." (Dkt# 223 at 4). Thus, she observes, "the settlement agreement would include all potential claims against all of the parties to the agreement." *Id.* However, potential litigation claims against the parties who have signed the Proposed Settlement Agreement is distinct from the existing State Court Litigation. Currently, there are essentially three complaints comprising the State Court Ligation. While the court can attempt to guess which claims the Trustee is dismissing and which she is remanding back to State Court based on the Reply to the Settlement Motion, it is her burden to show what claims are being settled under this compromise.

The Trustee asserts that her counsel has spent over 250 hours on this matter, reviewing thousands of pages of subpoenaed documents and interviewing the parties and related third parties. Thus, she maintains, the court should defer to the Trustee's determination that in her best business judgment, the Settlement Agreement is fair and in the best interests of the creditors and the Estate. While the court agrees that "court[s] generally gives deference to a trustee's business judgment in deciding whether to settle a matter", the Trustee nonetheless has the burden of persuading the court that the compromise is fair and equitable. *See In re Mickey Thompson Entertainment Group, Inc., supra,* 292 B.R. at 420. If the Trustee is basing her evaluation of the claims on the advice of counsel, then counsel's explanation of the litigation risks associated with the claims must be provided. If the Trustee is basing her conclusion on her own analysis of the claims being resolved, she

---

**27.** In addition to the Mikich/DBPB POC in the total amount of $1,209,480.08, reflecting an unsecured claim of $300,611.92 and secured claim of $908,868.16, there appears to be a proof of claim filed by Acquisition Facilitator, LLC, a Coletti entity, with a secured claim of $296,155.83 and a proof of claim filed by Out Door Marketing, LLC, ostensibly another Coletti entity, with an unsecured claim of $762,165.39. It appears that no objections have been filed to either proof of claim.

should at least be able to identify what the claims are. Nothing of the sort has been provided here.[28]

The court appreciates the fact that the settlement provides for certain assets to remain with the Debtor that can then be disbursed among the creditors, and that sometimes, some recovery is better than nothing for creditors. However, the underlying basis for approving a settlement requires the court to determine that the settlement is fair and equitable to the Estate and to its creditors. Bearing this principle in mind, the court at this time cannot find that the Proposed Settlement Agreement is fair and equitable. It appears that there is relevant information missing with respect to the Proposed Settlement Agreement. Moreover, it appears that the agreement was essentially negotiated and determined between insiders of the Debtor without the participation of the remaining creditors. This is problematic because of the nature of parties involved to the Proposed Settlement Agreement. *See Matter of Foster Mortgage Corp.*, 68 F.3d 914, 918 (5th Cir.1995) (finding that both the bankruptcy court and district court erred in approving a settlement agreement under FRBP 9019 that "was reached between insiders without the participation of the creditors ... [thus] not showing proper deference to the views of the creditors.").

While courts favor settlements that will quickly resolve claims and disputes for the benefit of the bankruptcy estate and its

creditors, the nature of the parties involved in this particular matter necessitates further investigation.

**IT IS THEREFORE ORDERED** that the Motion to Approve Asset Purchase and Compromise of Claims brought by Yvette Weinstein, Docket No. 204, be, and the same hereby is, **DENIED WITHOUT PREJUDICE.**

---

**28.** Without such information, courts would be faced exactly with what is apparent in this case: counsel for the settling party minimizing the merits of the claims against his client(s) and counsel for the objecting creditor(s) trumpeting the estate's claims against the settling parties. Without an independent and articulable analysis of the claims from trustee's counsel, a trustee's asserted reliance on counsel's assessment has little value,

particularly when numerous complex claims involving multiple parties are present. Likewise, when a trustee relies "on my vast experience as a Trustee, having administered thousands of cases" in entering into a proposed settlement, *see* Supplemental Trustee Declaration, Dkt# 224, at ¶ 16, at a bare minimum such a trustee should be able to identify the claims and interests being released, and articulate their value.